[No. B062367. Second Dist., Div. Six. Oct. 22, 1992.]

THE PEOPLE, Plaintiff and Repondent, v.
CHARLES COLLINS, Defendant and Appellant.

COUNSEL

Dan Mrotek, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Ronald E. Niver and David Rose, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

YEGAN, J.—Charles Collins appeals from his involuntary commitment as a mentally disordered offender (MDO) following a unanimous jury finding that he meets the criteria of Penal Code section 2962.[1] He contends: "I. The trial court erred in giving special instruction No. 1 and CALJIC 2.90 as modified and its error was prejudicial. II. The trial court erred in instruction with CALJIC 16.141 that force or violence was battery and its error was prejudicial. III. The trial court erred in failing to give a modified version of CALJIC 2.01 sua sponte and its error was prejudicial with respect to the remission criterion. IV. No substantial evidence supports the verdict with respect to the force or violence criterion and the judgment must therefore be reversed." Appellant's first and second contentions are meritorious and we reverse.

Appellant was convicted of grand theft from the person (§ 487, subd. 2) on January 7, 1988. He was entitled to be released on parole on May 9, 1991.

---

[1]All further statutory references are to this code unless otherwise specified.

The Board of Prison Terms found that he met the MDO criteria and ordered him committed to Atascadero State Hospital for treatment during his parole period. (§ 2966, subd. (a).) Appellant disagreed and filed a petition for jury trial of the issue. (§ 2966, subd. (b).)

At trial appellant's treating psychiatrist, Doctor Knapp, and an independent psychologist, Doctor Donaldson, testified to his condition and other MDO criteria. Knapp testified that in June of 1991 appellant told a social worker he was going to kill his parole officer. Hospital officials took the threat seriously and issued a warning to the officer as required by law. (See *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166].) Both opined he had a severe mental disorder. Knapp testified it was not in remission. Donaldson testified it was in remission but could not be kept in remission without treatment.

Both doctors opined appellant's commitment offense was caused or aggravated by his mental disorder. Both believed that appellant represented a substantial danger of physical harm to others when he acted out as a result of his mental disorder.

Doctor Knapp testified he had spoken with appellant about the commitment offense which involved the theft of a Hulk Hogan doll from a four-year-old girl. Appellant's explanations were varied and unreasonable. At times appellant said he did not mean to grab the doll or that the child did not want to give him the doll. Other times he claimed he traded a cartoon for the doll. Appellant's inculpatory statements lead Knapp to opine that appellant used force to wrest the doll from the child.

The district attorney called appellant to testify without objection. He was questioned about the Hulk Hogan doll incident, other arrests and offenses, and some of the statements he had made while taking psychological tests.

Appellant claimed he had traded a cartoon for the doll and that the girl's mother lied when she testified he had also taken the girl's ring. Appellant denied using force or violence. He testified that he pled guilty after seven months in jail so he could be sent to a mental hospital and avoid further pretrial incarceration. He also claimed the threat about his parole officer was a joke.

The trial court instructed the jury under special instruction number 1, in pertinent part, as follows: "The individual person comes before the court within Section 2966(b) . . . and may be hospitalized for [the balance of his

parole, although he has the right to annual review], if the evidence proves beyond a reasonable doubt that he meets the following criteria . . . ." The jury was also instructed: "A petitioner in a proceeding under PC 2962 is presumed to be entitled to be released on parole unless the contrary is proved beyond a reasonable doubt. This presumption places upon the People the burden of proving the petitioner meets the criteria necessary for continued treatment by proof beyond a reasonable doubt."

Section 2962, subdivisions (b) and (e) requires a determination that the crime for which appellant was sent to prison involved force, violence, or "serious bodily injury." CALJIC No. 16.141—the standard definition of force or violence for purposes of battery—was given to define force and violence.[2]

The record does not show which side requested the instructions. The trial court stated: "Instructions have been reviewed by both counsel and jury verdict form and they're acceptable to both sides; is that right?" Appellant's trial counsel and the district attorney responded "yes." The verdict form states: "We, the jury, FIND that Petitioner is a person as described in Section 2962 of the Penal Code of the State of California, and he should be treated by the Department of Mental Health as an inpatient." The unused verdict form states: "We, the jury, DO NOT FIND that Petitioner is a person as described in Section 2962 of the Penal Code of the State of California, and he should be released on parole."

■ Respondent claims the instructional errors were invited or waived. In *People* v. *Gibson* (1988) 204 Cal.App.3d 1425 [252 Cal.Rptr. 56], we analyzed this statutory scheme prior to its amendment in 1989 and held it was "essentially penal in nature." (*Id.*, at p. 1434.) Subsequent amendments have cured the constitutional defects identified in *Gibson* by amending its retroactivity provision (§ 2980) and adding a present dangerousness requirement (§ 2962). The MDO scheme nevertheless retains its essentially penal nature.

We hold that appellate rules dealing with instructions in criminal cases apply to MDO proceedings. Since no conscious, deliberate, or tactical reason

---

[2]CALJIC No. 16.141: "As used in the foregoing instruction, the words 'force' and 'violence' are synonymous and mean any [unlawful] application of physical force against the person of another, even though it causes no pain or bodily harm or leaves no mark and even though only the feelings of such person are injured by the act. The slightest [unlawful] touching, if done in an insolent, rude, or an angry manner, is sufficient. [¶] It is not necessary that the touching be done in actual anger or with actual malice; it is sufficient if it was unwarranted and unjustifiable. [¶] The touching essential to a battery may be a touching of the person, of the person's clothing, or of something attached to or closely connected with the person."

was stated for concurring in the instructions, there was no invited error or waiver of the instructional error claims. (§ 1259; *People* v. *Cooper* (1991) 53 Cal.3d 771, 830-831 [281 Cal.Rptr. 90, 809 P.2d 865]. See also *Conservatorship of Walker* (1987) 196 Cal.App.3d 1082, 1092, fn. 5 [242 Cal.Rptr. 289] imposing sua sponte duties on trial courts to instruct at conservatorship trials.)

The trial court erred by instructing the jury with the aforementioned parts of special instruction No. 1 and the modification of CALJIC No. 2.90. Together, these instructions told the jury that it would determine whether appellant should be hospitalized or released on parole.

To defend the instruction, respondent relies on *People* v. *Moore* (1985) 166 Cal.App.3d 540, 552 [211 Cal.Rptr. 856]. There, the court held that if requested by the defense or the jury, the jury should be instructed that a verdict of not guilty by reason of insanity would result in the accused's involuntary commitment to a mental hospital. (CALJIC No. 4.01.) The case and the instruction were cited with approval by the Supreme Court in *People* v. *Kelly* (1992) 1 Cal.4th 495, 538 [3 Cal.Rptr.2d 677, 822 P.2d 385]. The instruction is designed to alleviate any juror fear that an insanity finding will result in the release of the accused into the community.

However a verdict finding a petitioner to be MDO is more analogous to the consequences of extending the commitment of a person who has been found not guilty by reason of insanity (hereafter NGI). An NGI recommitment verdict determines whether the person will be released from confinement or continued to be involuntarily treated (§ 1026.5, subds. (b)(1) and (8)), We hold that the rule of *People* v. *Kipp* (1986) 187 Cal.App.3d 748, 750-751 [232 Cal.Rptr. 87], rather than *Moore*, is controlling.

*Kipp* held it is error to advise the jury in an NGI extension proceeding that their verdict will decide whether the petitioner should be released or continue to be confined for involuntary treatment. Such an instruction is likely to distort the verdict because the jury could fear his release and be more inclined to rule against the NGI committee regardless of the evidence. (187 Cal.App.3d at p. 751.)

Both *Moore* and *Kipp* have a similar rationale: a jury may be instructed about the consequences of a verdict regarding mental illness when it is designed to alleviate fear and prejudice toward the mentally ill. It is error, however, to instruct on the consequences of such a verdict when it would encourage the jury to ignore the evidence and decide the case based on their fear.

We hold it was error to instruct the jury of the consequences of MDO finding. As stated in *Kipp*: "There can be no purpose to advising a jury of the consequences of its decision under the present circumstances, except to improperly deflect its attention from the issue of the defendant's current mental condition to the possible effect of a decision to find [in his favor], i.e., to 'stack the deck' against the defendant. . . . The instruction . . . blatantly suggests the jury should weigh the potential effect of a sanity finding on the same scale used to make the determination itself. . . ." (*People* v. *Kipp, supra,* 187 Cal.App.3d at p. 751.)

The error was exacerbated here. The verdict forms led the jury to believe it was deciding whether appellant should be treated as an inpatient or released.[3] It permitted the prosecutor to devote his opening statement and closing argument to the consequences of the verdict, i.e., if the jury did not find appellant met the criteria he would be back on the streets or on the bus to Los Angeles and be free to terrorize others. The prosecutor argued that appellant should be held in Atascadero until the doctors say he is safe to come out.

■ Appellant's second contention is also meritorious. We hold that the words in the phrase, "force or violence," used in section 2962, subdivisions (d)(l) and (e) are not synonymous and that it is error to give CALJIC No. 16.141 at MDO trials.[4] It is unlikely the Legislature meant "force" and "violence" to be synonymous for MDO purposes. Such interpretation would mean the statute is redundant.

Our scrutiny of the MDO statutory scheme, coupled with the legislative history, leads us to opine, that the language chosen by the Legislature is, in all probability, at odds with the legislative intent gleaned from the various versions of the bill, the various analysis thereof, and the materials and letters written thereon. (See Legis. History compiled by Legis. Intent Service.)

Senate Bill No. 1296, which became section 2960 after its passage, does not have an extensive legislative history. The quoted language—now found in section 2962, subdivisions (d) and (e)—was part of the original bill as introduced and remained unchanged through several subsequent revisions and amendments. The only significant change relating to this language was

---

[3]We also observe that this notion is at odds with the present statutory scheme. Even after an adverse MDO finding, the person may be released for outpatient treatment upon certification by the State Department of Mental Health that he or she ". . . can be safely and effectively treated on an outpatient basis . . . ." (§ 2964, subd. (a).)

[4]Section 2962, subdivision (e) provides: "The crime referred to in subdivision (b) was a crime in which the prisoner used force or violence, or caused serious bodily injury as defined in paragraph (5) of subdivision (f) of Section 243."

that it was added to the certification criteria in section 2962, subdivision (b) by amendment. (See Stats. 1987, ch. 687, § 7, p. 2180.) This certification is done by the Department of Corrections (hereafter DOC) to the Board of Prison Terms.

Instructive is the fact that during the bill's pending before the Legislature in 1985 the documents describing the bill and its function frequently referred to it as affecting "violent offenders" or persons convicted of "violent offenses." (See, e.g., Statement by Sen. McCorquodale on Sen. Bill No. 1296, Mar. 26, 1985.) An April 16, 1985, letter from the office of the Attorney General to Senator McCorquodale refers to the bill as affecting "mentally disordered violent offenders." The legislative analyst's May 2, 1985, analysis of Senate Bill No. 1296 refers to it as affecting only parolees who served sentences for "violent offenses."

The estimates of the numbers of severely mentally ill violent offenders affected by the legislation indicate it was addressed to a class of offenders much smaller than would be affected if the definition of force and violence in CALJIC No. 16.141 was intended. For example, a March 19, 1985, letter from Daniel J. McCarthy, Director of Corrections, to Senator Robert Presley, a cosponsor of Senate Bill No. 1296, shows data regarding MDO prison inmates by category. Violent offenders—noted to be potentially affected by the bill—included only those severely mentally ill inmates who had committed crimes such as homicide, robbery, assault, sex crimes, and kidnapping.

It is unlikely that the Legislature intended CALJIC No. 16.141 to be the standard for "force" and "violence" at a MDO trial. Otherwise a "slight touching" done in an insolent, rude, or angry manner could lead to potential lifetime confinement.

The legislative choice of words, "force" or "violence," to describe the underlying criminal offense for a MDO commitment can be rationally viewed as separate and distinct. For example, the use of the word "force" does not necessarily mean force against the person and may theoretically be based upon a crime which entails the use of force on property, e.g., forced entry of a dwelling to commit a residential burglary. Similarly, use of the word "violence" carries the connotation of more than a simple touching required for a battery. (E.g., CALJIC No. 16.141.) A simple touching may occur without "violence." Moreover, the infliction of "serious bodily injury" as defined in section 243, subdivision (f)(5) could be accomplished without use of force or violence, i.e., when a person sends poison candy to his or her victim and the victim suffers "serious bodily injury."

As indicated, these theoretical and hypothetical illustrations are at odds with the legislative history. The Legislature may wish to amend the definition of what qualifies as an underlying offense. Our reading of the materials

leads us to suggest that the Legislature may have had in mind those offenses specified in section 667.5, subdivision (c), i.e., the "violent felonies" added by Proposition 8, the "Victims' Bill of Rights." Nevertheless, we take the statute as we find it. We adopt an interpretation which avoids redundancy and accords significance to each word or phrase of the statute. (See *Pacific Legal Foundation* v. *Unemployment Ins. Appeals. Bd.* (1981) 29 Cal.3d 101, 114 [172 Cal.Rptr. 194, 624 P.2d 244].) On retrial, the court should not give CALJIC No. 16.141. The words, "force" and "violence," are words of ordinary meaning and require no further definition. (*People* v. *Stewart* (1979) 89 Cal.App.3d 992, 999 [153 Cal.Rptr. 242]; *People* v. *Jones* (1971) 19 Cal.App.3d 437, 447 [96 Cal.Rptr. 795].)

As to appellant's third contention, he claims that the conflict with respect to circumstantial evidence concerning remission created a sua sponte duty to give a CALJIC No. 2.01 instruction. We disagree. There is no such obligation where, as here, the People do not rest their case entirely or substantially on circumstantial evidence. (*People* v. *Wiley* (1976) 18 Cal.3d 162, 175 [133 Cal.Rptr. 135, 554 P.2d 881].)

█ On retrial, the trial court shall not instruct the jury with CALJIC No. 16.141. Nor shall it instruct on the consequences of an MDO finding, permit the prosecution to comment thereon, or use verdict forms which purport to deal with the consequences thereof. These cumulative errors were prejudicial. It is reasonably probable a verdict more favorable to appellant would have resulted in the absence of these errors. (Cal. Const., art. VI, § 13.)

█ Given our resolution of the other issues in this appeal and the facts of the instant case, we opine that the evidence would be sufficient to support the jury's determination but for the errors which require a new trial. Thus, new trial is not barred by the jeopardy provisions of the United States and California Constitutions. (*Burks* v. *United States* (1978) 437 U.S. 1, 18 [57 L.Ed.2d 1, 14, 98 S.Ct. 2141]; *People* v. *Pierce* (1979) 24 Cal.3d 199, 209-210 [155 Cal.Rptr. 657, 595 P.2d 91].)

Finally, here the prosecutor called appellant to the witness stand and asked questions going beyond his mental state. On retrial, the prosecutor may not ask appellant questions concerning the underlying offense as this would be violative of the United States and California Constitutions.

█ "[A]n accused has an absolute right not to be called as a witness and not to testify. (U.S. Const., Amend. V; Cal. Const., art. I, § 15, as codified in Evid. Code, § 930; *Cramer* v. *Tyars* (1979) 23 Cal.3d 131, 137 [151 Cal.Rptr.

653, 588 P.2d 793].) The historic purpose of the constitutional privilege against being called as a prosecution witness has been to assure that the criminal justice system remains accusatorial, not inquisitorial. (*Malloy* v. *Hogan* (1964) 378 U.S. 1, 11 [12 L.Ed.2d 653, 661, 84 S.Ct. 1489]; *Cramer* v. *Tyars*, *supra*, 23 Cal.3d 131, 137-138.) Thus, the state must convict and punish an individual by its independent efforts, not by compelling an accused to testify against himself. (*Estelle* v. *Smith* (1981) 451 U.S. 454, 462 [68 L.Ed.2d 359, 368, 101 S.Ct. 1866].) [¶] Of course, this privilege does not apply to revelation of the witness's physical or mental characteristics where they are relevant to the issues being considered. (*Cramer* v. *Tyars*, *supra*, 23 Cal.3d 131, 137.)" (*People* v. *Pretzer* (1992) 9 Cal.App.4th 1078, 1083-1084 [11 Cal.Rptr.2d 860, 863].)

The judgment is reversed.

Stone (S. J.), P. J., and Gilbert, J., concurred.