Filed 3/6/14  Conservatorship of Christopher B. CA3

# <u>NOT</u> <u>TO</u> <u>BE</u> PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Placer)

----

| | |
|---|---|
| Conservatorship of the Person and Estate of CHRISTOPHER B. | C073478 |
| | (Super. Ct. No. S-MH-0001523) |
| LIZ HROMADA, as Public Guardian, etc., | |
| Petitioner and Respondent, | |
| v. | |
| CHRISTOPHER B., | |
| Objector and Appellant. | |

Christopher B. appeals from a trial court order (judgment), based on a jury verdict, that imposed a one-year civil commitment upon him—a so-called "Murphy" conservatorship for psychiatric treatment—pursuant to the Lanterman-Petris-Short Act (LPS).  (Welf. & Inst. Code, §§ 5000 et seq., 5350, 5361, 5008, subd. (h)(1)(B); see

1

*People v. Karriker* (2007) 149 Cal.App.4th 763, 774-775 (*Karriker*).)[1]  This

conservatorship is imposed when a person faces certain felony charges and a jury finds

that, due to a mental disorder, the person (1) is unable to assist his defense counsel in a

rational manner, and (2) represents a substantial danger of physical harm to others.

(§ 5008, subd. (h)(1)(B); *Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 176-177

(*Hofferber*).)

On appeal, Christopher B. challenges the sufficiency of the evidence and certain

instructions regarding these two elements, as well as a prohibition on entering

contracts—a prohibition the Placer County Public Guardian (the Conservator) concedes

must be the subject of a remand.

We agree with Christopher B. there was insufficient evidence presented of his

current ability to assist defense counsel (i.e., his current incompetency).  However, as a

practical matter, our agreement will not much help Christopher B., as his one-year civil

commitment is set to expire on March 27, 2014, and the Conservator concedes that

should it choose to renew the conservatorship, the issue of Christopher B.'s current

competency will need to be reevaluated.[2]  Consequently, we shall reverse the order

(judgment) of commitment, accepting the Conservator's concessions that

Christopher B.'s contractual prohibition and his current competency must be reevaluated

should the Conservator choose to renew the Murphy conservatorship.

**FACTUAL AND PROCEDURAL BACKGROUND**

*The Proceedings Before Us*

In 2009, the Placer County Superior Court twice found Christopher B.

incompetent to stand trial, within the meaning of Penal Code section 1368, on felony

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

[2]  We granted Christopher B.'s request to expedite this appeal.

charges (still pending) of criminal threats, stalking, and possession of a firearm by a felon. (Pen. Code §§, 422, 646.9, subd. (a), former 12021, subd. (a)(1), respectively.) Based on these two findings of incompetency and periodic reports from Napa State Hospital (Napa), where Christopher B. was committed, the Superior Court periodically extended Christopher B.'s commitment from 2009 to 2012 in an attempt to restore his competency to stand trial on these charges.

When this three-year attempt failed, Napa recommended that the Conservator place Christopher B. under a Murphy conservatorship. Christopher B.'s principal diagnosis is delusional disorder, persecutory type. The pending felony charges against Christopher B. involved threats and stalking concerning Christopher B.'s ex-wife, F.F., and one of her daughters (his former stepdaughter). These felony charges are subject to a Murphy conservatorship, which requires pending felony charges—based on probable cause—that involve "a serious threat to the physical well-being of another person." (§ 5008, subd. (h)(1)(B)(i); *Hofferber*, *supra*, 28 Cal.3d at p. 174; *Karriker*, *supra*, 149 Cal.App.4th at pp. 776-777.)

The Conservator accepted Napa's recommendation of a Murphy conservatorship and instituted those proceedings, culminating in a March 27, 2013 trial court "Order Appointing LPS Conservator," which constitutes the order (judgment) before us on appeal.

### *Evidence at the Murphy Conservatorship Jury Trial*

1. Christopher B.'s testimony regarding F.F.

Christopher B. testified he met F.F. on Labor Day 2000 and moved into her apartment in December of that year. F.F. lived in the apartment with her two teen-aged daughters from a prior marriage (whose father was Ron G.). F.F. became pregnant and married Christopher B. in January 2001; their daughter was born in July 2001.

Christopher B. and F.F.'s relationship soured and in November 2001 a physical altercation ensued. Christopher B. left the apartment at F.F.'s demand.

The day before Thanksgiving of 2001, Christopher B. met F.F. in a mall so he could see their daughter. At one point, F.F. cried out that Christopher B.—who was holding their daughter and apparently moving away—was stealing the child, and a bystander intervened on F.F.'s behalf. Christopher B. could see absolutely no reason for this bystander's intervention.

Christopher B. was similarly mystified the next day, when F.F. threatened to call the police when he appeared at F.F.'s apartment to spend Thanksgiving together.

And Christopher B. was again perplexed, just four days later on November 26, 2001, by the actions of F.F.'s mother, who tried—physically, verbally, and eventually successfully—to prevent him from taking his daughter, after he broke into F.F.'s apartment at 3:30 a.m. and was carrying the child off in his arms.

After this November 26 incident, F.F. obtained a temporary restraining order against Christopher B. Eventually, F.F. divorced Christopher B. and never again initiated contact with him. Christopher B.'s parental rights to their daughter were terminated as well.

2. Prior arrest, conviction, and MDO[3] commitment.

Christopher B. was pulled over in his car by the police in early 2002 while apparently following Ron G.'s car; this was not long after Christopher B. had threatened Ron G. to stay away from F.F. "or there would be consequences," and after Christopher B. had engaged in conduct that Ron G. characterized as harassing. The officer found in Christopher B.'s car a "tire thumper" (akin to a billy club), three or four large knives, a loaded sawed-off shotgun, and a rifle with a scope.

---

[3] MDO is the acronym for mentally disordered offender. (Pen. Code, § 2960 et seq.)

In September 2003, Christopher B. pleaded no contest to stalking and possession of a billy club. He was sentenced to four years eight months in state prison. During the present Murphy conservatorship proceedings in 2013, Christopher B. denied any wrongdoing regarding this 2003 conviction, blamed his 2003 attorney, and maintained he was simply the victim of a coincidental and unfortunate series of events.

From early 2005 through late 2007, Christopher B. was found to be an MDO and placed at Atascadero State Hospital (Atascadero), a finding he challenged unsuccessfully in litigation. Christopher B. has never accepted the diagnosis that he has a delusional disorder, and he refused to take medication at Atascadero until ordered to do so.

3. Christopher B.'s conduct following Atascadero and leading to the present proceeding.

In 2008, following his release from Atascadero, Christopher B. harassed Ron G. about F.F. (Ron G. was now married to another woman and living in Tennessee); and, over extended periods beginning in 2008, Christopher B. threatened F.F. and one of her daughters—formerly Christopher B.'s stepdaughter.

This behavior culminated in the pending felony charges against Christopher B. for criminal threats, stalking, and possession of a firearm by a felon. (Pen. Code, §§ 422; 646.9, subd. (a), former 12021, subd. (a)(1), respectively.)

As noted, in 2009, the Placer County Superior Court found Christopher B. not competent to stand trial on these charges. Napa tried unsuccessfully over a three-year period to restore Christopher B.'s competency; the principal issues being Christopher B.'s belief he could not receive a fair trial due to the conspiracies against him by his attorneys, the legal system, and F.F., and his refusal to participate effectively in treatment based on his belief he does not have any mental illness.

4. Psychiatric testimony.

Steven Sugden, M.D., a clinical psychiatrist, diagnosed Christopher B., in line with previous diagnostic reports, with a non-bizarre delusional disorder (i.e., extreme distortion of reality, as opposed to a bizarre delusional disorder such as schizophrenia with no basis in reality), and also with an antisocial personality disorder.

Due to this mental disorder, Dr. Sugden concluded that Christopher B. was not competent to stand trial on the pending felony charges and represented a substantial danger of physical harm to others.

We will set forth additional facts, as pertinent, in discussing the issues on appeal.

## DISCUSSION

Christopher B. raises evidentiary sufficiency and instructional issues.

Specifically, Christopher B. claims the evidence is insufficient to support each of the following elements of a Murphy conservatorship: Due to a mental disorder, Christopher B. represents a substantial danger of physical harm to others and is not currently competent to stand trial. (§ 5008, subd. (h)(1)(B); *Hofferber*, *supra*, 28 Cal.3d at pp. 176-177; see *Karriker*, *supra*, 149 Cal.App.4th at p. 776.)[4] Also, Christopher B. challenges the evidence supporting his contractual prohibition.

As for the instructions, Christopher B. contends the trial court erred (1) in defining a delusional disorder in terms of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM) (4th ed. 1994) (DSM-IV), (2) in

---

[4] The remaining elements of a Murphy conservatorship, applicable here, are: A pending felony charge involving a serious threat to another's physical well-being, and a prior finding of mental incompetency under Penal Code section 1370. If the initial conservatorship proceedings follow within a reasonable time after a defendant has been found incompetent in criminal court, this finding of incompetency may be judicially noticed as a finding of current incompetency as well. (§ 5008, subd. (h)(1)(B); *Hofferber*, *supra*, 28 Cal.3d at pp. 179-180.)

6

instructing on the definition of an MDO, (3) in requiring the lower "preponderance of the evidence" standard of proof and a verdict of nine jurors for the competency finding, and (4) in instructing on the consequences of the jury's verdict.

We agree with Christopher B.'s claim of evidentiary insufficiency regarding current incompetency, and agree the contractual prohibition was imposed pursuant to an improper procedure, but disagree with his other contentions.

## I.  Sufficiency of the Evidence

In reviewing the sufficiency of the evidence, we review the entire record in the light most favorable to the challenged finding to determine whether there is any reasonable and credible evidence to support it.  (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.)

### A.  Mental Disorder Resulting in Substantial Danger of Physical Harm to Others

1.  Mental disorder.

Dr. Sugden, the psychiatrist who testified on the Conservator's behalf, diagnosed Christopher B., in line with several other diagnoses over several years, principally with a "non-bizarre" delusional disorder, mixed type (erotomanic type, grandiose type, jealous type, depending on the stressors present), and also with an attendant antisocial personality disorder.

Dr. Sugden based this diagnosis on (1) his review of Christopher B.'s mental health records from Atascadero and Napa (as well as law enforcement and court-related records), (2) his observing almost all of Christopher B.'s testimony in the current proceeding, and (3) his direct experience with Christopher B. as Christopher B.'s attending physician for about six weeks when Christopher B. transitioned in 2012 from Napa to his current psychiatric facility.

7

Dr. Sugden explained how Christopher B. meets the DSM criteria for a delusional disorder (later onset in life; the contrast with schizophrenia for which Christopher B. has never been diagnosed; functionality aside from the delusion; persecutory beliefs; long-standing fixed nature notwithstanding the contrary reality). The doctor also explained how Christopher B. meets the DSM criteria for an antisocial personality disorder (unlawful conduct; deceitfulness [in obtaining firearm]; impulsivity and disregard of safety [the November 26, 2001 incident of taking his daughter in the dead of night]; and lack of remorse [rationalizing his conduct]).

Christopher B. contends the evidence of mental disorder is insufficient largely because Dr. Sugden never explained how he could determine, clinically, what part of Christopher B.'s beliefs was true and what part was delusional because of a mental disorder. Sugden, though, diagnosed Christopher B. as having a non-bizarre delusional disorder of mixed type (dependent upon various stressors), meaning that, essentially, Christopher B. would take a small dose of reality and manufacture it into an overdose of unreality based on delusional thinking. The *point* at which reality transforms to unreality may be difficult to pinpoint, but the overall progression is clear. As Sugden explained, "a non-bizarre delusion may have some premises of truth, [but] ends up going to extremes." For example, Christopher B.'s inability to comprehend why F.F.'s mother would object on November 26, 2001, to his forcibly entering F.F.'s apartment through the kitchen window at 3:30 in the morning and trying to flee with their daughter in his arms, shows delusional thinking.

Christopher B. also challenges the evidentiary sufficiency of Dr. Sugden's diagnosis of antisocial personality disorder. Christopher B. claims the diagnosis was based improperly on the sole criterion of Christopher B.'s repeated criminal behavior. (*People v. Superior Court* (*Williams*) (1991) 233 Cal.App.3d 477, 490-491 [a diagnosis

of antisocial personality disorder may constitute substantial evidence of a mental disorder if based on criteria in addition to repeated criminal *or* antisocial behavior].)

As noted above, Dr. Sugden did not rely solely on the criterion of criminal behavior but also noted the criteria of deceitfulness, impulsivity, reckless disregard for safety, and lack of remorse; Sugden further based this diagnosis on his witnessing Christopher B.'s trial testimony; and, in any event, the critical mental disorder diagnosed here was delusional disorder—antisocial personality disorder was a mere sidekick to that.

Based on the above, we conclude there is sufficient evidence that Christopher B. suffers from a mental disorder for purposes of a Murphy conservatorship.

2. Resulting in substantial danger to others.

Dr. Sugden opined that, due to Christopher B.'s delusional disorder, Christopher B. represents a substantial danger of physical harm to others.

Dr. Sugden based his opinion on Christopher B.'s past behavior; Christopher B.'s denial of any disorder and any wrongdoing (consequently, Christopher B. lacks any insight into the disorder); certain static risk factors for violence (Christopher B.'s military experience, familiarity with and history of obtaining firearms, past legal experiences angering him, and history of not obeying court orders); and certain dynamic risk factors for violence (Christopher B.'s current delusional beliefs; and angry, dehumanizing and threatening expressions to F.F. and her daughter). Furthermore, Sugden noted, Christopher B.'s antisocial personality disorder, together with his delusional disorder, make each more difficult to treat.

Dr. Sugden concluded that a delusional felon familiar with firearms, such as Christopher B., who breaks the law by possessing weapons, who now hates his ex-wife, who has threatened physical harm to her and her daughter, and who has pursued them for a decade, constitutes a substantial danger of physical harm to her and her family.

9

We conclude there is sufficient evidence that, due to his delusional disorder, Christopher B. represents a substantial danger of physical harm to others.

### B. *Mental Disorder Resulting in Current Incompetency*

At the Murphy conservatorship trial in March 2013, Dr. Sugden was asked on direct examination:

"[B]ased on the evidence that you have reviewed in this case, do you believe that due to [Christopher B.'s] mental impairment, his delusional disorder mixed type, that he remains incompetent to stand trial on the pending criminal charges?"

Dr. Sugden answered:

"There were six reports conducted, two prior to his going to Napa State Hospital, four while he was at Napa State Hospital. Various experts sat on those panels making that determination . . . that came to the conclusion that he was incompetent to stand trial. To date I have not seen any records generated to the contrary to give a . . . doubt to that. And based upon that, I do—I would support what has been established by the six records."

On cross-examination, Dr. Sugden was asked:

"In your opinion—not the opinion of the records you reviewed—but your personal opinion, why is [Christopher B.] not competent to stand trial in a criminal case?"

Dr. Sugden responded, as pertinent:

"My opinion is—I have never tried to assess him with regards to competency. I am not qualified. I don't do forensic evaluations. I am not a forensic psychiatrist to make that determination. That's a forensic question. . . . I am a treating psychiatrist. And so my opinion is based upon the records that I have reviewed."

Prior to Dr. Sugden's testimony, the trial court properly gave a limiting instruction, telling the jury it could consider reports of other experts—reports Sugden

10

would refer to in his testimony—in considering the basis for Sugden's opinion, but could not consider those reports as independent proof of Christopher B.'s mental condition because such reports are hearsay.

Dr. Sugden's "opinion" that Christopher B. is currently incompetent to stand trial on the pending felony charges is not sufficient evidence of Christopher B.'s current incompetency. This is because Sugden did not actually so opine, but merely relayed, in inadmissible hearsay fashion, that other experts had. "An expert witness may not, on direct examination, reveal the content of reports prepared or opinions expressed by nontestifying experts. ' " 'The reason for this is obvious. The opportunity of cross-examining the other doctors as to the basis for their opinion, etc., is denied the party as to whom the testimony is adverse.' " ' " (*People v. Campos* (1995) 32 Cal.App.4th 304, 308.)

On two bases, the Conservator argues there still remains sufficient evidence of Christopher B.'s current incompetency.

First, the Conservator invokes the principle from *Hofferber* that, "[i]f initial conservatorship proceedings follow within a reasonable time after [the] defendant has been found incompetent in criminal court, the conservatorship adjudicators may by judicial notice rely on the prior finding [of incompetence]." (*Hofferber*, *supra*, 28 Cal.3d at pp. 179-180.) The Conservator notes the trial court here took judicial notice that the Superior Court (1) twice found, in 2009, that Christopher B. was incompetent to stand trial on the pending charges, (2) three times, during November 2009 through January 2012, extended Christopher B.'s commitment at Napa for treatment to restore competency as recommended in periodic progress reports from Napa, and (3) in September 2012 placed Christopher B. on a temporary conservatorship for six months as the prelude to the present Murphy conservatorship proceeding (which took place in March 2013).

11

The sufficiency problem with this evidence is that the two Superior Court findings of incompetency, in 2009, are not recent enough for *Hofferber* purposes, and the four remaining judicially noticed items were determinations made without a contested adjudicatory process available to Christopher B., as *Hofferber* envisioned.[5]  (*Hofferber*, *supra*, 28 Cal.3d at p. 179 ["If initial conservatorship proceedings follow *within a reasonable time after* [*the*] *defendant has been found incompetent in criminal court . . .*" (italics added)].)

As a second argument for claiming evidentiary sufficiency of current incompetency, the Conservator "submits that a preexisting delusional condition which (1) existed from 2005-2007 in Atascadero, (2) prevented criminal prosecution from July of 2009 through September of 2012 while being unsuccessfully treated in Napa, (3) is unlikely to be cured, and (4) was shown to still exist by [Christopher B.'s] own trial testimony and Dr. Sugden's testimony, is substantial evidence from which the jury could reasonably conclude that [Christopher B.] was incompetent at the time of the Murphy conservatorship trial."

The problem with this argument is that all of this same evidence was presented to Dr. Sugden as well.  The upshot of this argument, then, is that the lay jury, presented with this evidence, was qualified to find Christopher B. currently incompetent, while the treating psychiatrist, Dr. Sugden, presented with the same evidence, did not believe himself so qualified.  The underlying evidentiary problem, again, is that Sugden improperly relayed the hearsay opinions of other experts as independent proof of

---

**5**  At trial, the Conservator had moved for a directed verdict of Christopher B.'s current incompetency, based on these judicially noticed items.  The trial court deferred ruling pending jury determination, and the Conservator withdrew the motion after the jury verdict.

Christopher B.'s current incompetency, rather than properly using those opinions as a basis for his own opinion on the matter.**6**

We conclude the evidence is insufficient that, due to a mental disorder, Christopher B. is currently incompetent to stand trial on the present felony charges. This conclusion, though, will not be of much help to Christopher B. This opinion will issue near the end of Christopher B.'s current one-year Murphy conservatorship. We accept, however, the Conservator's concession, quoting *Hofferber*, that "[a]ny *renewal* of the [Murphy] conservatorship must, of course, be based on *updated evidence* of the conservatee's incompetence." (*Hofferber*, *supra*, 28 Cal.3d at p. 180, italics added.)

## II. Jury Instruction Issues

Christopher B. raises four instructional issues. We find no basis to reverse on any of them, individually or cumulatively.

### A. Mental Disorder Defined in DSM

Christopher B. contends the trial court erred in limiting the term "mental disorder" to those mental disorders described in DSM-IV. Christopher B. argues that a court may not delegate to a therapist the power over instructions on the law, especially given the science-based criticism that has greeted the DSM's recent revision, DSM-5 (5th ed. 2013).

Case law has recognized, however, that the term "mental disorder" is limited to those disorders listed in the DSM. (*Karriker*, *supra*, 149 Cal.App.4th at p. 775, fn. 4.) As a practical matter, there are not many alternative definitions, as evidenced by

---

**6** In cross-examining Dr. Sugden, Christopher B.'s counsel also tried to show that the doctor was unqualified to render an opinion on "substantial danger" in the same way the doctor was unqualified to render an opinion on current competency. As we have seen, though, Dr. Sugden, on a proper basis, gave his *own* opinion that Christopher B. represented a substantial danger of physical harm to others.

Christopher B.'s failure to suggest any. The DSM used here was DSM-IV (1994), and the DSM remains the standard text in the psychiatric community notwithstanding the recent controversies surrounding the introduction of DSM-5 (2013).

We conclude the trial court properly instructed on this point.

### B. Instruction on MDO Elements

Christopher B. contends the trial court erred in instructing the jury on the elements of an MDO, as those elements were not at issue in this LPS Murphy conservatorship proceeding and would tend to confuse the jury as to the correct elements the jury was to determine.

The trial court instructed, "A prisoner can be confined in a state mental hospital for his or her parole as a mentally disordered offender if the following criteria are met: One, the patient has a severe mental disorder for over 90 days that's not in remission; two, the patient cannot be safely and effectively treated in an outpatient program; and, three, the patient by reason of a serious mental disorder represents a substantial danger of physical harm to others."

At trial, evidence was presented that Christopher B. had been committed to Atascadero as an MDO for a three-year period. This was evidence of Christopher B.'s psychiatric history, a relevant issue at trial. In light of this evidence, one can argue that it would have been just as confusing, perhaps more so, *not* to instruct the jury on what an MDO is. In any event, the special verdict form here, and another instruction, stated precisely the elements the jury was to determine in this LPS Murphy conservatorship proceeding.

We conclude the trial court did not err in this respect.

14

### C. Competency Finding—Preponderance Standard with Nine Jurors

Christopher B. contends the trial court misinstructed that the competency determination required only a nine-juror finding based on a standard of proof of preponderance of the evidence.

This instruction is in line with state Supreme Court authority. (*Hofferber*, *supra*, 28 Cal.3d at pp. 178-179.) Christopher B. concedes this authority, and makes this argument to preserve the issue for further review. We must follow the Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 458.) Christopher B. has preserved his point.

### D. Consequences of Its Verdict

The trial court instructed the jury, "If you find the conservatee [(Christopher B.)] to be gravely disabled [(i.e., find the LPS Murphy conservatorship requirements are met)], the Court may continue the conservatorship of his person and estate"; and the court added, "The conservator may place the conservatee in a state, county, medical, psychiatric, nursing or other state-licensed facility, or private hospital, or in a residential center, board and care home, or in the conservatee's own home or the home of a relative or friend."

Christopher B. argues these instructions were erroneous under *People v. Collins* (1992) 10 Cal.App.4th 690 (an MDO case), because the instructions told the jury that its verdict would determine whether Christopher B. would be released or would continue to be confined; such an instruction, says *Collins*, is likely to distort the verdict because the jury, fearing release, would be more inclined to rule in favor of continued confinement regardless of the evidence. (*Id.* at p. 695.)

Assuming for the sake of argument the trial court erred in providing these instructions, it is not reasonably probable that Christopher B. would have fared any better in their absence. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [setting forth this standard

of harmless error].) Under the challenged instructions, the trial court stated that if the jury found the Murphy conservatorship requirements were met, the court "*may* continue" Christopher B.'s conservatorship; and, if the conservatorship were continued, Christopher B. could be placed in his "*own home*" or "the home of a relative or friend." (Italics added.) These instructions, then, are quite unlike those in *Collins*, which stated that the outcome of the jury's verdict would be the person's release or continued confinement, prejudicing the jury against release.

Finding at most one harmless error in the instructions Christopher B. challenges, we find no cumulative prejudicial effect based on them.

### III. Restriction on Right to Enter Contract

Finally, Christopher B. contends the evidence is insufficient to support the trial court's conservatorship-related order that prohibited him from entering contracts.

At the post-jury verdict hearing establishing the details of Christopher B.'s conservatorship, Christopher B.'s counsel stipulated to the imposition of this prohibition.

As the Conservator concedes, however, it is improper for a court to accept a stipulation imposing such a prohibition (termed, "disabilities") without the conservatee's express waiver of a hearing on the matter. (*Conservatorship of Christopher A.* (2006) 139 Cal.App.4th 604, 613.) Such an express waiver did not occur here.

The Conservator also concedes the need for a remand to conduct a hearing on any such prohibition, or to obtain Christopher B.'s express waiver of such a hearing. If a renewal of the Murphy conservatorship is near in time or ongoing when this opinion is issued, this remand may well be moot and the discussion herein may serve simply as an admonition of the correct procedure to follow in imposing conservatorship disabilities (prohibitions). Of course, a remand is also moot if Christopher B. is no longer subject to a Murphy conservatorship.

16

## DISPOSITION

We reverse the order (judgment) of Christopher B.'s commitment under an LPS Murphy conservatorship (a one-year commitment at or near its end), based on the insufficiency of evidence of Christopher B.'s current incompetency as discussed in this opinion (see Discussion, pt. I.B, *ante*, at pp. 10-13.) We accept the Conservator's concessions that Christopher B.'s contractual prohibition and his current competency must be reevaluated should the Conservator choose to renew Christopher B.'s Murphy conservatorship.


      BUTZ      , J.


We concur:


     BLEASE     , Acting P. J.


     MURRAY     , J.

17