Filed 12/7/22  P. v. Perez CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>ELIJAH ELOJIO PEREZ,<br><br>     Defendant and Appellant. | F082332<br><br>(Super. Ct. No. PCF317388A)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Melinda Myrle Reed, Judge.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Darren Indermill, Robert K. Gezi, and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Elijah Elojio Perez was convicted of several crimes arising out of an alleged gang-related attack on a dropout of the Norteño gang. We accept the Attorney General's concession that the gang-related conviction and enhancements must be reversed pursuant to Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), but otherwise reject defendant's contentions and affirm the remainder of the judgment.

## BACKGROUND

In an information filed September 22, 2015, the Tulare County District Attorney charged defendant with willful, deliberate and premeditated attempted murder (count 1; Pen. Code,[1] §§ 187, 664), assault with a deadly weapon by means of force likely to cause great bodily injury (count 2; § 245, subd. (a)(1)), and active participation in a criminal street gang (count 3; § 186.22, subd. (a).) The information further alleged that the attempted murder and assault with a deadly weapon were committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)). Finally, the information alleged a prior prison term allegation under section 667.5, former subdivision (b).

Defendant admitted the prior prison term. A jury convicted him on all three charges and the gang enhancements.

The court sentenced defendant to 15 years to life on count 1, to run consecutively to his sentence in another case. The court also sentenced defendant to stayed (§ 654) counts of four years on count 2, plus five years for the gang enhancement, and three years on count 3.

---

[1]Undesignated statutory references are to the Penal Code

2.

**FACTS**

*Testimony of Jose Alcantar*

When he was younger, Jose Alcantar[2] was jumped into a gang called the East Side Poros, which is a Northern (i.e., Norteño) gang. Jose remained in the gang for eight or nine years. By the time of his trial testimony in February 2016, Jose claimed his gang membership was a long time ago and that he had made a mistake.

Jose said it is "pretty bad" for someone to leave a gang because the rule is that when "[y]ou are in, you are in." Gang members take the issue "very seriously" and consider those who drop out to be "enemies." Dropouts are sometimes attacked, but more often are ignored.

Jose said his fellow gang members "probably" told him about gang activities, but he does not remember because he had alcohol problems. When Jose left the gang, he relocated and tried to stay away from "everyone."

On April 28, 2015, Jose went to meet his friend Beto around 9:00 p.m. at an alley in Porterville. As Jose was driving his truck down the alley, he saw "a lot of people," and it seemed liked a party. The people were "[d]rinking, mellowing, just hanging out." Beto was not there. Jose stopped in his truck and stayed for a couple of minutes. He got out of the truck, went to a little house nearby, and smoked a joint for "probably about 20 minutes."[3] As he was about to leave, he was attacked by "like ten scum bags."[4] He was stabbed nine or 10 times. As he ran away, he noticed he was bleeding "a lot" from the side of his chest.

Jose was hospitalized for about five days and underwent surgery as a result of his injuries. He has several scars from the attack.

---

[2]We will refer to Jose and his brother Cesar by their first names to distinguish one from the other.

[3]Elsewhere the residence is referred to as an "apartment" rather than a "little house."

[4]Later, he estimated there were 15 assailants.

### Statement to Police

Jose told Detective Tyson Tashiro that a man named Elijah was one of the attackers. Jose said he knew Elijah from "prior gang association."

Jose also said a man with the moniker "B-rad" was involved in the attack. Jose said he had a prior conflict with B-rad because Jose was known as a "dropout" or a "rat."

Jose said that while he was in the apartment, "some chubby dude" came in and asked him, "'Hey can I talk to you real quick?'" B-rad and defendant were outside with a group of people. Jose said, "What's up?" and the group surrounded him. Defendant was standing in the center and asked Jose what his name was. B-rad asked Jose if he remembered who he was. Jose said he remembered. The group of about 15 or 20 people then attacked Jose, hitting and punching him. Eventually, a "young dude" wearing a red shirt stabbed him. The attackers were yelling out, "West Side."

Defendant was "the main one" involved in the attack. Defendant was telling the group to attack Jose. When Jose took off running, defendant told people nearby, "'Stop him, stop him.'"

Detective Tashiro interviewed Jose again the next day and showed him a photographic lineup. Jose identified defendant as the "Elijah" who had been involved in his attack. Jose also identified codefendant Albert Garcia as "B-rad."[5]

### Additional Trial Testimony of Jose Alcantar

At trial, Jose testified he did not remember who stabbed him. Nor did he remember telling police that one of the individuals involved was named Elijah. He also testified he did not remember telling police he had connections with an individual named "B-rad."

Jose testified he did not remember viewing or signing a photographic lineup. However, he recognized the signature on a lineup presented by the prosecutor as his own.

---

[5]Albert Garcia suffered several convictions as a result of this incident, which we affirmed in our nonpublished opinion in *People v. Garcia* (Jan. 22, 2019, F073921).

He admitted he did not want to come to court and had to be arrested and compelled to come to court.[6]

Jose denied telling police that B-rad had previously accused him of being a rat. However, he acknowledged that if he had been accused of being a rat, that would make him subject to attack by his gang. He would have had to leave the gang.

Jose claimed he did not even remember speaking to police, due to his prior heavy marijuana use.

### Detective Tyson Tashiro

When Detective Tyson Tashiro initially tried to talk to Jose after the attack, Jose was "loopy, in and out" and was in a lot of pain. Jose was reluctant to talk to him. However, he eventually did speak with Tashiro as described above.

Detective Tashiro also met defendant about a month later. He matched the description Jose had given him for the Elijah involved in the attack with the description of defendant.

Detective Tashiro testified B-rad had tattoos of "T" and "C" on his right and left arms, respectively. Northern gang members often have "T.C." tattoos to reflect their loyalty and affiliation with the Tulare County Northern gang clique.

### Christina D. and Megan D.

Christina D. testified she lived in a trailer with her boyfriend Gerald and a man named Elijah.[7] Elijah did not respect her home and would play music loudly.

On April 28, Jose walked through Megan D.'s house even though she did not know him. Jose went to Christina's trailer nearby. Eventually, Jose left.

---

[6]Later testimony clarified that Jose had to be compelled to testify in earlier proceedings in this case, but not for his trial testimony.

[7]Other testimony establishes Gerald's last name is Salas. An investigator testified that he attempted to locate Salas to obtain his testimony for trial but was unable to do so after almost three months of searching.

Christina told police she saw 20 individuals surrounding Jose outside. When asked what she saw next, Christina said she did not see exactly what happened, but that Jose was attacked. She said her roommate, Elijah, seemed to be leading the attackers. Christina believed Jose was stabbed and then ran down the driveway as the group chased him. In a photographic lineup following the incident, Christina identified a photograph of defendant as the "Elijah" she witnessed in the crime.

At trial, however, Christina denied telling Detective Ward that she saw Jose surrounded by 20 individuals. When asked if she told Ward that Jose had been stabbed and fled on foot, Christina testified: "I don't know." When asked if she told Ward that Elijah had "started it," Christina testified: "I don't know." Christina also denied seeing Elijah in the courtroom at trial.

Megan D. also saw Jose being hit and fall to the floor. A lot of the people in the crowd were wearing red clothing. Jose then "took off." Megan did not see anyone get stabbed. Megan testified defendant was present in the crowd at the time, but she could not tell what he or any of the other people around were doing.

During the law enforcement investigation, Megan was unwilling to meet with Detective Tashiro at her residence because gang members were possibly watching. Tashiro scheduled a meeting with Megan at a different location, but she did not show up. Tashiro was not able to contact Megan thereafter. Megan was subpoenaed but failed to contact Tashiro for court arrangements. She was taken into custody and brought to court. Megan was scared.

*Tina G.*

Tina G. has a child with defendant. On June 28, 2013, Tina told a sheriff's deputy that defendant had threatened her. Tina told the deputy that defendant was possibly a Northern gang member. While they were speaking, defendant sent her a picture via text message of him making gang signs. The picture, which was later admitted into evidence,

depicted defendant "throwing out gang signs with a 'W' and 'S.'" The deputy testified that his training and experience indicated the sign represented "West Side."

***Gang Expert***

Detective Lancelot Kirk testified as a gang expert for the prosecution. The Northerners or Norteños is a gang active in Tulare County. It is the largest Hispanic gang in Northern California, with a presence in virtually every community in Northern California.

In Porterville, the Norteño gang has three "cliques" or "subsets": the East Side Poros (or East Side Varrios Poros), the Varrios Centro Poros, and the West Side Poros. Above the "clique" level, Norteño leaders coordinate and keep them together as a gang. The leader of Porterville Norteños at the time of the present incident was named Pedro Sanchez, also known as "Pistol Pete."

The symbol of the Norteños is the number 14, referring to the letter "N" as in Nuestra Familia or Norteño. The colors of the Norteño gang are red, black, and white.

One of the rules of the Norteño gang is that members must remain members for life and never drop out. Becoming a dropout is "completely unacceptable" to the Norteño gang. It is expected that active Norteños will punish any dropout they come across.

## DISCUSSION

**I.     The Evidence Adduced at Trial Concerning Predicate Offenses Failed to Satisfy Requirements Subsequently Enacted by Assembly Bill 333**

**A.     Background**

Detective Kirk testified about a robbery he investigated that was committed by other Norteño gang members in June 2009. The corresponding felony complaint reflected the robbery was committed on June 8, 2009. Kirk also testified about a robbery committed by Norteños in April 2011.

7.

Justin H. testified that on June 11, 2012, several males approached him saying this was "their street" and to "F off." The males called him "Peckerwood." They threw bottles at him and stabbed him with an ice pick. Defendant was one of the males Justin was fighting with. However, defendant was not the person who stabbed him.

**B.     Concession**

In the initial respondent's brief, the Attorney General argued the current offense plus the 2012 incident involving Justin H. satisfied the predicate offense requirements of the gang statute. In subsequent briefing, the Attorney General now concedes that under Assembly Bill 333, the current offense may no longer be used to establish the predicate offense requirements, that reversal of the substantive gang offense and enhancements is required, and that defendant may be retried.[8] Defendant requests that we accept this concession, which we do.

We reverse both the gang offense and gang enhancements, and defendant may be retried on remand. (See *People v. Vasquez, supra*, 74 Cal.App.5th at p. 1033.)

## II.     Sufficient Evidence Supported Jury's Findings of Intent to Kill and Premeditation/Deliberation

Defendant contends there was insufficient evidence of intent to kill and premeditation/deliberation.

---

[8]"While defendant's appeal was pending, the Legislature enacted Assembly Bill 333, the STEP Forward Act of 2021, which, in part, amends section 186.22 to impose new substantive and procedural requirements for gang allegations. Assembly Bill 333 … 'redefines "pattern of criminal gang activity" to require that the last of the predicate offenses "occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed," and that the predicate offenses "were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit of the offenses is more than reputational." [Citation.]' [Citation.] 'In addition, the currently charged offense cannot be used as a predicate offense under the amendments' made by Assembly Bill 333." (*People v. Vasquez* (2022) 74 Cal.App.5th 1021, 1032.) The legislation went into effect on January 1, 2022.

## A. Applicable Law

"In reviewing the sufficiency of evidence to support a conviction, we review the entire record to determine whether there is reasonable and credible evidence such that a reasonable trier of fact could find defendant guilty beyond a reasonable doubt. [Citation.] We view the evidence and draw all reasonable inferences therefrom in favor of the judgment. [Citation.] We do not reevaluate witness credibility nor do we reweigh the evidence. [Citation.] The same standard of review applies to prosecutions relying upon circumstantial evidence of guilt." (*People v. Ramos* (2011) 193 Cal.App.4th 43, 47.)

"'"Even where, as here, the evidence of guilt is largely circumstantial, our task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might '"be reasonably reconciled with the defendant's innocence."'"'" (*People v. Pettigrew* (2021) 62 Cal.App.5th 477, 490–491.) "'"If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding."'" (*Id.* at p. 491.)

"Evidence of intent to kill is usually inferred from defendant's acts and the circumstances of the crime." (*People v. Ramos*, *supra*, 193 Cal.App.4th at p. 48.)

Reviewing courts consider a number of factors in determining whether there was sufficient evidence of deliberation and premeditation, including planning activity, motive, and the manner in which the crime was committed. (*People v. Pettigrew*, *supra*, 62 Cal.App.5th at p. 492.)

## B. Analysis

Evidence favorable to the judgment supported the following version of events.

The Norteño gang expects its members to punish any dropout they come across. Jose had a prior conflict with a member of the Norteño gang because he was known as a dropout.

One day, Jose was lured outside to a group of 15 to 20 people who quickly surrounded him. Defendant, a Norteño, was the apparent leader of the group. The group included at least one other known Norteño. Many of the people were wearing red, the color of the Norteño gang, and the group was yelling out, "West Side."

B-rad, the Norteño with whom Jose had a prior conflict over his dropout status, asked Jose if he remembered who he was. Defendant, the "main one," who was standing at the center, told the group to attack Jose. The group brutally attacked Jose, punching and stabbing him. When Jose tried to escape, defendant asked people nearby to stop him.

Jose sustained serious injuries and was drifting in and out of consciousness when he made it to the front porch of his brother Cesar's home. His injuries necessitated surgery and a five-day hospitalization.

These facts support several relevant inferences the jury could have reasonably accepted. First, that sometime before Jose was lured outside, defendant planned with the group to conduct a gang-related physical attack on Jose because he was a dropout.[9] Such a finding would in turn support an inference that defendant, as an apparent leader of the group, would have directed, or at least known, how the attack would occur—including the usage of a knife.[10] Defendant's efforts to stop Jose from escaping after the stabbing are also consistent with such a conclusion.

---

[9]Defendant posits that "the mere fact a number of people were outside in the area does not indicate planning activity" because a group of people were congregated in the area when the victim arrived. But we have more than the mere fact a number of people were outside in the area; we also know that the group quickly surrounded Jose after he was called outside by an individual. This circumstance certainly supports an inference that the attack was planned, even if only minutes before it began.

[10]Defendant counters that this reasoning is "speculation." Not so.

"[W]hether evidence 'raises' or 'supports' a particular inference is a matter of probability. Relevant evidence increases the apparent probability a particular fact is true. Some evidence increases that apparent probability greatly, and other evidence does so slightly. There is a point on this spectrum above which the probabilistic connections between the evidence and proposed inference are deemed 'reasonable' and below which weaker probabilistic connections

This evidence and chain of inferences clearly support findings of intent to kill and premeditation/deliberation. Defendant tried to stop Jose from escaping even after he sustained substantial injuries and stab wounds. A jury could reasonably conclude that defendant was not content with injuring Jose and wanted him dead. The inference that the group, including defendant, planned the attack coupled with the near-deadly force used in the attack and the attempt to prevent escape, supports a finding of premeditation/deliberation.[11] (See *People v. Pettigrew*, *supra*, 62 Cal.App.5th at p. 492 [evidence of planning and manner of attack is pertinent to sufficiency of evidence of premeditation/deliberation].)

Defendant says there is "no evidence" he advised the use of a knife, had advanced knowledge of its use, or shared the knife-wielder's intent. Not so. While there is (unsurprisingly) no *direct* evidence of defendant's knowledge or intent—such as defendant testifying that he knew and intended that a knife would be used—there is *circumstantial* evidence to that effect, as summarized above.

---

are deemed 'speculation' or 'conjecture.' (Evid. Code, § 600, subd. (b) [an inference is a deduction of fact that may logically and 'reasonably' be drawn from another fact].) In this way, the law distinguishes between facts that can 'logically and reasonably be drawn' from the evidence [citation] versus evidence which 'merely raises a possibility' a particular fact is true. [Citation.] The former is called a reasonable inference; the latter is called speculation and is 'not a sufficient basis for an inference of fact.'" (*People v. Bell* (2020) 47 Cal.App.5th 153, 180.)

That defendant would know the particulars of the attack—including the usage of a knife—is an inference that can be "logically and reasonably" drawn from the facts that (1) defendant was an apparent leader of the group which comprised at least some Norteños, (2) the attack was likely planned at least some point in advance given that Jose was lured outside, and (3) defendant tried to stop Jose's escape even after the stabbing. Of course, this evidence does not prove the inference "to a certainty," but that is not required. (*People v. Bell*, *supra*, 47 Cal.App.5th at p. 180.) Because the inference here can be logically and reasonably drawn from the evidence, it is not speculation.

[11]Defendant acknowledges there was evidence of motive but contends that is not independently sufficient to establish premeditation/deliberation. As summarized herein, there was substantial evidence beyond motive.

Defendant discounts the evidence he tried to prevent Jose from escaping, contending there was "no evidence" he knew Jose had been stabbed. Again, while there is no *direct* evidence of defendant's knowledge, there was circumstantial evidence supporting an inference that he knew. The evidence that defendant was himself attacking Jose and was, therefore, in close proximity to him when he was stabbed, raises an inference that defendant saw the stabbing or its after-effects.

It is not dispositive that some of the circumstances might point the other way. For example, defendant argues that the manner of attempted killing lacked "particularity and exactitude" but instead was more "frenzied." But the jury's verdict was supported by the planning and motive evidence. The fact that there were some aspects of the evidence that could be reconciled with a contrary finding is immaterial on substantial evidence review.

## III. Hearsay and Confrontation Clause Issues

Defendant contends testimonial hearsay was admitted at trial in violation of the confrontation clause.

### A. Applicable Law

The Sixth Amendment guarantees a defendant the right "to be confronted with the witnesses against him." (U.S. Const., 6th Amend.) The constitutional right refers to "witnesses," meaning those who "'bear testimony.'" (*Crawford v. Washington* (2004) 541 U.S. 36, 51.) As a result, testimonial statements of witnesses absent from trial are admissible "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." (*Id.* at p. 59.)

However, "[g]ang experts, like all others, can rely on background information accepted in their field of expertise under the traditional latitude given by the Evidence Code. They can rely on information within their personal knowledge, and they can give an opinion based on a hypothetical including case-specific facts that are properly proven." (*People v. Sanchez* (2016) 63 Cal.4th 665, 685 (*Sanchez*).) "'In addition to

matters within their own personal knowledge, experts may relate information acquired through their training and experience, even though that information may have been derived from conversations with others, lectures, study of learned treatises, etc.' [Citation.] '[A]n expert's testimony concerning his general knowledge, even if technically hearsay, has not been subject to exclusion on hearsay grounds.'" (*People v. Valencia* (2021) 11 Cal.5th 818, 831 (*Valencia*).) For example, a gang expert may testify about a specific gang's conduct, territory, history, general operations, symbols, and colors. (*Sanchez*, at p. 698; *Valencia*, at p. 838.) A gang expert may also render an opinion regarding the gang membership of the perpetrator of a predicate offense in response to a proper hypothetical question based on premises established by competent evidence. (*Valencia*, at p. 839.)

"What they cannot do is present, as facts, the content of testimonial hearsay statements." (*Sanchez*, *supra*, 63 Cal.4th at p. 685.) For example, the prosecution may not use a gang expert's recitation of testimonial hearsay concerning a defendant's police contacts to prove intent to benefit a particular gang. (See *id*. at pp. 698–699.) Nor may an expert testify as to the commission of a particular offense on a specific occasion without personal knowledge or independent, admissible evidence thereof. (*Valencia*, *supra*, 11 Cal.5th at p. 838.)

"When the People offer statements about a completed crime, made to an investigating officer by a nontestifying witness, … those hearsay statements are generally testimonial unless they are made in the context of an ongoing emergency …, or for some primary purpose other than preserving facts for use at trial." (*Sanchez*, *supra*, 63 Cal.4th at p. 694.) Field identification cards are testimonial when they are produced in the course of an ongoing criminal investigation. (*Id*. at p. 697.)

The key dividing line is between "hearsay that may be admitted because it is generally accepted by experts in the field" versus "facts that cannot be proven by hearsay because that reliability justification is absent." (*Valencia*, *supra*, 11 Cal.5th at p. 837.)

13.

These rules reflect the proper role of expert testimony, which is "to help the jury understand the significance of case-specific facts proven by competent evidence, not to place before the jury otherwise unsubstantiated assertions of fact." (*Valencia*, *supra*, 11 Cal.5th at p. 837.)

## B.    Background

Detective Kirk testified that he "researched" defendant's gang history and "found" a number of contacts with law enforcement. In conducting his research, Kirk used police reports, field interviews, prior jail classifications, and "any sort of law enforcement documentation."

Detective Kirk testified that defendant had been the subject of seven separate field interviews and 12 arrests by the Porterville Police Department. Kirk testified that "a good majority" of defendant's criminal history and arrests were violent in nature.

In closing argument, the prosecutor argued defendant "has done this before and he knows how to do this type of assault." The prosecutor then discussed the Justin H. incident. The prosecutor argued the Justin H. incident had "the same exact setup as we have in this case." Defendant "allows someone else to do knifing while he uses his fist. That's what he does. He is a strong guy. He is leading the attack that way. That's what he did here."

## C.    Analysis

### 1.    *Confrontation Clause*

Whether Detective Kirk's challenged testimony ran afoul of the confrontation clause depends on where the information was obtained. Kirk broadly identified several sources for his "research" in the case: police reports, field interviews, prior jail classifications and "any sort of law enforcement documentation." But most of the time Kirk did not identify which of these various sources supported each specific part of his

testimony.  And that is crucial to determining whether a confrontation clause violation occurred.

If Detective Kirk's testimony concerning defendant's 12 arrests and the violent nature of the offenses for which he was arrested was predicated on police reports, it was almost certainly testimonial and violative of the confrontation clause.  (See *Sanchez*, *supra*, 63 Cal.4th at pp. 694–695.)  If the testimony was based on a field interview Kirk did not conduct, it would violate the confrontation clause *if* the field identification card was produced in the course of an ongoing criminal investigation.  (*Id*. at p. 697.)  However, if it was based on a field identification card created in a casual, nontestimonial situation, it would not violate the confrontation clause.  (See *People v. Martinez* (2018) 19 Cal.App.5th 853, 860 [field identification cards can be created in casual, nontestimonial situations].)  If the testimony was based on other "law enforcement documentation," its propriety would depend on whether the documentation in question was testimonial hearsay.  Finally, if the testimony was based on prior jail classification interviews, it likely did *not* violate the confrontation clause.  (See *People v. Leon* (2016) 243 Cal.App.4th 1003, 1018–1020.)

On the present record, we cannot determine whether this portion of Detective Kirk's testimony was inadmissible under federal law.  Defendant has failed to carry his burden of demonstrating error under the confrontation clause.  (See *People v. Ochoa* (2017) 7 Cal.App.5th 575, 585–586 [absent showing in the record, court will not assume expert relied on testimonial hearsay].)  We next turn to whether the evidence was admissible under state hearsay rules.

### 2. *State Hearsay Rule*

While the confrontation clause prohibits recitation of *testimonial* hearsay in most circumstances, our state hearsay rules generally prohibit recitation of *case-specific* hearsay on a matter which the expert has no personal knowledge, *regardless* of whether

15.

the hearsay is testimonial or not. (See *Sanchez*, *supra*, 63 Cal.4th at pp. 676, 684.) Detective Kirk's testimony that he "researched" defendant's gang history and "found" a number of contacts with law enforcement strongly indicates he was relying on hearsay rather than personal knowledge of the contacts. And the hearsay concerned specific events involving defendant, rather than information generally accepted in a field of expertise, which means it was case-specific and therefore inadmissible. (See *Valencia*, *supra*, 11 Cal.5th at p. 838.)

Accordingly, we turn to the issue of prejudice, which we analyze under the familiar rule of *People v. Watson* (1956) 46 Cal.2d 818.[12] (See *People v. Thompkins* (2020) 50 Cal.App.5th 365, 419.)

In seeking to establish prejudice, defendant points to the importance of defendant's (and B-rad's) gang membership. We do not doubt the importance of their gang membership to the prosecution's case. However, defendant correctly concedes that his gang membership was established by other, properly admitted evidence. He contends that "nevertheless," Detective Kirk's testimony about defendant's arrests for violent offenses was prejudicial. He argues the jury likely used the testimony to conclude he was "a man of bad character, with a criminal disposition, predisposed to violence." However, the jury was expressly and specifically instructed not to do that. The court told the jury that it may not conclude from gang activity evidence that "the defendant is [a] person of bad character or that he has a disposition to commit crime."

---

[12]Because we are reversing them other grounds, we do not reach defendant's hearsay challenge to the gang participation conviction and gang enhancement. (See, e.g., *People v. Mendez* (2018) 21 Cal.App.5th 654, 662; *People v. Navarrete* (2010) 181 Cal.App.4th 828, 837.) In several instances, defendant's brief suggests his hearsay/Sixth Amendment claim is directed only to the gang participation conviction and the gang enhancement. However, there are some comments in the briefing touching on the issues of intent to kill and premeditation/deliberation. Consequently, we will evaluate prejudice as to those determinations.

16.

### 3. *Prosecutor's Argument*

Defendant responds that the prosecutor's argument gave the jury "every reason to disregard the court's instruction." However, this contention contravenes the well-known assumption that jurors follow the court's instructions. (See *People v. McCurdy* (2014) 59 Cal.4th 1063, 1096; *People v. Malik* (2017) 16 Cal.App.5th 587, 599.)

Moreover, the court instructed the jurors that they must decide the facts based on the evidence, and the statements of counsel in closing argument are not evidence. The court also instructed the jurors that they must follow the law as stated by the court even if they believed it conflicted with an attorney's comments on the law. Again, we assume the jurors followed these instructions.

Finally, the prosecutor's argument cited by defendant spoke of the Justin H. incident as evidence defendant knew how to assault people and had a particular modus operandi, not evidence of bad character. (See Evid. Code, § 1101 [distinguishing prior acts evidence used to establish character versus knowledge].) Moreover, defendant has not established the Justin H. incident was proven by inadmissible evidence.

For these reasons, we conclude Detective Kirk's improper hearsay testimony was not prejudicial.

## IV. Defendant Has Not Established Ineffective Assistance of Counsel

"To establish ineffective assistance of counsel, a defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and counsel's deficient performance was prejudicial, that is, there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant." *(People v. Sepulveda* (2020) 47 Cal.App.5th 291, 301.)

"'In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel

17.

on appeal unless there could be no *conceivable* reason for counsel's acts or omissions.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1051, italics added.)

## A.     Ineffective Assistance for Failing to Object to Opinion Evidence

Defendant contends trial counsel was ineffective for failing to object to Detective Kirk's testimony regarding how Norteño gang members treat dropouts.

Kirk testified as follows:

> "Q.  If someone had violated the real important rules of the gang, would that lead to attempted murder rather than something—or someone just being jumped?
>
> "A.  Yes. I think I have testified to earlier that becoming a dropout of the Norteño gang is punishable oftentimes by severe injury or death so if a dropout Norteño is the victim of assault by Norteño gang members where Norteño gang members are using weapons, deadly weapons during the assault of him, it would be my belief that they are attempting to kill him."

Defendant notes that experts cannot express their general belief as to how the case should be decided.  True, but that is not what Detective Kirk was doing.  Instead, he was testifying about the significance of certain circumstances in light of his expertise.  He employed his knowledge about Norteño culture and conduct to offer an opinion on the significance of armed Norteños assaulting a dropout.  This was not improper.

"'An examiner may ask an expert to assume a certain set of case-specific facts for which there is independent competent evidence, then ask the expert what conclusions the expert would draw from those assumed facts.  … The expert is permitted to give his opinion because the significance of certain facts may not be clear to a lay juror lacking the expert's specialized knowledge and experience.'"  (*Valencia*, *supra*, 11 Cal.5th at p. 832.)

Counsel is not ineffective for failing to make a meritless objection.

## B. Lack of Objection to Jail Classification Admissions

Detective Kirk testified that defendant and Garcia had been taken into custody on multiple prior occasions, and their "gang classification while going into the jail was documented as Northern."

Defendant argues his counsel was ineffective for failing to object to this testimony, since non-*Mirandized*[13] responses to jail classification questions are inadmissible. (See *People v. Elizalde* (2015) 61 Cal.4th 523, 538–540.) However, the record sheds no light on why counsel did not object to jail classification evidence. As a result, we must reject the claim if there is any *conceivable* explanation for counsel's inaction. (See *People v. Nguyen*, *supra*, 61 Cal.4th at p. 1051.)

Here there are several possible explanations for the lack of objection, including at least one that would not involve deficient performance. One conceivable explanation is that defendant was *Mirandized* before giving the responses to the jail classification questions and counsel was aware of that fact. In that circumstance, an objection made pursuant to *People v. Elizalde* would be meritless and counsel would not be ineffective for declining to make one. Because there is a conceivable explanation, we must reject the claim on direct appeal.[14]

## C. Lack of Objection to Predicate Offense Evidence

Defendant contends counsel was ineffective for failing to object to the facts and circumstances of the predicate offenses. It appears defendant believes counsel should have made an objection on relevance or Evidence Code section 352 grounds. He asserts that proof the offense was committed is all that was required, and that the facts and circumstances of the offense "have no probative value." But the "facts" of the offense *is*

---

[13]*Miranda v. Arizona* (1966) 384 U.S. 436.

[14]Of course, it is also possible that, even though *People v. Elizalde* was decided seven months before the testimony in question was elicited, counsel simply missed the issue. In that scenario, counsel's failure to object would likely constitute deficient performance. Any such claim would need to be pursued, if at all, in habeas corpus proceedings.

the proof that it was committed. In other words, the "facts" of a predicate offense have probative value in that they can show the predicate offense was committed as required by statute.

Surely, it is conceivable a prosecutor might improperly include gratuitous details of a predicate offense unnecessary to prove its commission and instead intended to inflame the jury. But, in his argument, defendant does not point to any *specific* circumstance of any particular predicate offense that was irrelevant or inflammatory. Rather, he argues that facts and circumstances of predicate offenses are generally not probative—a proposition we reject above.

**D.    Lack of Objection to Evidence Concerning Tina G.**

Recall that the prosecution introduced evidence that Tina G. told law enforcement that defendant was possibly a Northern gang member. Defendant also sent her a picture via text message of him making gang signs that represented "West Side."

Defendant argues counsel was ineffective for failure to object on relevance grounds. However, the bar for relevance is quite low. Evidence is relevant if it has *any* "tendency in reason to prove or disprove any disputed act that is of consequence to the determination of the action." (Evid. Code, § 210.) The evidence involving Tina G. was relevant in that it tended to show defendant's prior gang affiliation.

Defendant also refers to the "prejudice" inherent in this evidence. However, the sheriff's deputy simply testified that Tina G. said she had "been threatened" by defendant. No details of the alleged threat were provided. And Tina G. actually denied at trial that defendant had threatened her. Because no details—inflammatory or otherwise—of the alleged threat were shared by Tina G. or the sheriff's deputy, we cannot conclude counsel was prejudicially ineffective for failing to object.

**E.      Lack of Objection to Prosecutor's Argument**

*1.      References to Inability to Find Gerald Salas*

Defendant's next contention centers on the following portions of the prosecutor's closing argument:

> "There's really a river of fear that's been seeping through this entire case. Every one of the witnesses has been affected by it. Each civilian witness that we brought up has been either unwilling to repeat their statement about the gang, unwilling to repeat the statements that they had, unwilling to come forward and testify."

The prosecutor discussed the apparent fear Megan D. and Christina D. exhibited while testifying. The prosecutor then argued that Jose had the "most to lose" and had no incentive to implicate defendant and Garcia.

The following then occurred:

> "[PROSECUTOR:] … And moreover, as I mentioned, Gerald Salas is in hiding. We can't find him. We spent three months looking for him. He doesn't want to come into court. That all goes to show you—
>
> "[GARCIA'S COUNSEL:] Objection, states facts not in evidence.
>
> "[PROSECUTOR:] I believe there was evidence of Gerald Salas not being able to be found.
>
> "[GARCIA'S COUNSEL:] Not the ID.
>
> "THE COURT: Any further statement other than they couldn't find him, you cannot consider. [¶] Sustained."

The prosecutor then argued that the inability to find Salas further demonstrated the power of the gang.

Defendant argues that his counsel's failure to object to this argument constituted ineffective assistance of counsel. However, in order to establish such a claim, defendant must show prejudice resulting from the allegedly deficient performance. Here, counsel

for codefendant Garcia did make an objection.  Given that fact, there is no reason to conclude that defendant's counsel's lack of objection resulted in any prejudice.[15]

In any event, the prosecutor never said Salas had identified defendant.  Defendant says that prosecutor's argument "suggested" Salas had identified defendant and Garcia.  Not so.  The prosecutor made clear why he was referring to the inability to find Salas—to show the "power of the gang" and "what they are trying to accomplish."  In sum, the prosecutor did not refer to facts outside the record, and defense counsel was not deficient for failing to object.

### 2. *References to Law and Order*

In rebuttal closing argument, the prosecutor argued:

> "[PROSECUTOR:]  This case is a very important case, not just because Jose Alcantar who is the victim that he is involved in a lot of bad things before, involved a lot of gangs before, may not be the most sympathetic victim, involved in drugs.  It's not really all about him.  It's about whether or not we allow the Norteño street gang to rule our streets.  It's about whether or not we allow them—

> "[GARCIA'S COUNSEL:]  Objection, improper argument.

> "THE COURT:  Overruled.

> "[PROSECUTOR:]  It's about whether we allow him to intimidate to stop them from coming forward to report crimes, and we allow them, to let gang crimes go unpunished.  The fact that Jose Alcantar was almost killed is a testament of what Norteños can do and if these individuals are not held accountable it will no doubt occur again.

> "We are going to ask you to follow the evidence in this case and we believe based on the evidence, there's no other reasonable explanation that these two gang members attempted to kill Jose Alcantar …."

Defendant contends this argument was an improper appeal to have the jury convict to protect community values and civil order.  (See *U.S. v. Weatherspoon* (9th Cir. 2005)

---

[15]While the brief comments discussed in the next paragraph were made after Garcia's counsel's objection, they were not objectionable as explained therein.

22.

410 F.3d 1142, 1149.)  However, prosecutors are entitled to "'comment on the serious and increasing menace of criminal conduct and the necessity of a strong sense of duty on the part of jurors.'"  (*People v. Adanandus* (2007) 157 Cal.App.4th 496, 513.)

Moreover, immediately after the comments in question, the prosecutor urged the jury to convict based on the "evidence in this case" that defendant and Garcia attempted to murder.  Therefore, we do not believe the jury would have taken the prosecutor's argument to be an invitation to disregard the facts of the case and instead convict based solely on a desire for safe communities or an antagonism towards Norteños generally. We conclude that, under the circumstances presented here, "[n]o reasonable juror would have construed the remarks as urging the jurors to follow community sentiment rather than their own judgment."  (*People v. Lang* (1989) 49 Cal.3d 991, 1041 abrogated on another point by *People v. Diaz* (2015) 60 Cal.4th 1176, 1190.)

## V.     Section 1109 and Failure to Bifurcate the Charges

Defendant contends that the judgment should be reversed because newly enacted section 1109 "requires bifurcation upon request of counsel" and therefore "the trial court's denial of the request constitutes error."  We conclude any failure to bifurcate the gang allegations was harmless; thus, reversal of the underlying convictions is not required.

### A.     Applicable Law

Assembly Bill 333, effective January 1, 2022, added section 1109, which requires bifurcation of gang enhancements charged under section 186.22, subdivision (b) or (d) to be tried separately from the underlying charges upon request from the defense.  (Stats. 2021, ch. 699, § 5.)  Section 1109 also requires that the substantive offense of active participation in a criminal street gang (§ 186.22, subd. (a)) be tried separately from all other counts that do not require gang evidence as an element of the crime (§ 1109, subd. (b)).

23.

## B.    Analysis

The parties first dispute whether section 1109 applies retroactively.  The courts of appeal are split on whether section 1109 applies retroactively.  (Compare *People v. Burgos* (2022) 77 Cal.App.5th 550, 565–568 [holding § 1109 applies retroactively under *Estrada*], review granted July 13, 2022, S274743, and *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1128–1131 [same], with *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65 [holding § 1109 is not retroactive], review granted Aug. 17, 2022, S275341, *People v. Boukes* (2022) 83 Cal.App.5th 937, 948 [same], and *People v. Perez* (2022) 78 Cal.App.5th 192, 207 [same], review granted Aug. 17, 2022, S275090.)

Recently, in *People v. Tran* (2022) 13 Cal.5th 1169, 1208–1210 (*Tran*), the California Supreme Court declined to resolve the split, concluding any failure to bifurcate the gang allegations was harmless.  Notably, whether section 1109 applies retroactively to nonfinal cases is an issue currently pending before the California Supreme Court in *People v. Burgos*, *supra*, 77 Cal.App.5th 550.[16]

In reviewing for prejudice in *Tran*, the California Supreme Court concluded the failure to bifurcate in that case did not render the trial fundamentally unfair such that it required review under the standard for federal constitutional error articulated in *Chapman v. California* (1967) 386 U.S. 18.  (*Tran*, *supra*, 13 Cal.5th at p. 1209.)  Accordingly, the court considered whether the defendant was prejudiced under the state law standard of review articulated in *People v. Watson*, *supra*, 46 Cal.2d 818 and concluded the defendant had failed to establish prejudice as to his guilt verdicts.  (*Tran*, at p. 1209.)  In

---

[16]The California Supreme Court granted review in *People v. Burgos*, *supra*, 77 Cal.App.5th 550 and initially deferred action pending consideration and disposition of *Tran*. However, after issuing its opinion in *Tran*, the California Supreme Court issued a briefing order in *Burgos* on October 12, 2022, directing the respondent to file an opening brief on the merits limited to the following issue:  Does the provision of Penal Code section 1109 governing the bifurcation at trial of gang enhancements from the substantive offense or offenses apply retroactively to cases that are not yet final?

so holding, the *Tran* court rejected the contention the failure to bifurcate as required under section 1109 constitutes structural error. (*Tran*, at p. 1208.)

Here, as in *Tran*, it is unnecessary to address the parties' claims regarding retroactivity because we conclude the failure to bifurcate the proceedings was harmless. In so holding, and for the reasons discussed further *post*, we cannot conclude the admission of the gang evidence rendered the trial "fundamentally unfair" such that it resulted in a due process violation and requires us to review for prejudice under the *Chapman* standard for constitutional error. (See *Tran*, *supra*, 13 Cal.5th at p. 1209.)

Applying the *Watson* standard for state law error, we cannot conclude it is reasonably probable defendant would have obtained a more favorable verdict in the absence of the gang evidence that would not have been presented had the gang allegations been bifurcated. (See *People v. Watson*, *supra*, 46 Cal.2d at p. 836.) First, as in *Tran*, "[t]he case for guilt here was strong." (*People v. Tran*, *supra*, 13 Cal.5th at pp. 1209–1210.) While hospitalized after the attack, Jose identified defendant by his first name as the "main" perpetrator and then, the following day, Jose identified a picture of defendant in a photographic lineup. Additionally, two other witnesses to the incident— Christina D. and Megan D.— also reported defendant was present during the attack. Indeed, Christina reported to police that defendant, her roommate, was leading the attack. Thus, the reports of multiple eyewitnesses, including the victim, implicated defendant as a participant and leader in the attack.

Furthermore, nothing in Assembly Bill 333 limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges. "The People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense." (*People v. Chhoun* (2021) 11 Cal.5th 1, 31.) Gang evidence—"'including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying

force or fear, or other issues pertinent to guilt of the charged crime.'" (*Ibid.*, quoting *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) Additionally, "[e]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and … [a]n explanation of the basis for the witness's fear is likewise relevant to her credibility …." (*People v. Burgener* (2003) 29 Cal.4th 833, 869.)

And here, much of the gang evidence was relevant to the charged offenses. First, gang evidence was relevant to motive in that the People's theory of the case was that defendant and his group attacked Jose because Jose was an ex-gang member who had turned on the gang and was accused of being a "snitch." (See *People v. Williams* (1997) 16 Cal.4th 153, 193 ["in a gang-related case, gang evidence is admissible if relevant to motive or identity, so long as its probative value is not outweighed by its prejudicial effect"].) Thus, evidence of Jose's gang history, defendant's gang affiliation, and gang culture, particularly the view and treatment of drop-outs and "snitches" and expectations of gang members, was relevant to disputed factual issues in the case. (See *People v. Holmes, McClain, and Newborn* (2022) 12 Cal.5th 719, 772 ["Given the circumstances of the shootings, which were clearly intended as gang retaliation, defendants' membership was highly relevant to prove their involvement, motive, and intent to kill"]; accord, *People v. Duong* (2020) 10 Cal.5th 36, 64 [court did not prejudicially err in admitting gang evidence where "there was little question that evidence of defendant's gang membership was relevant to motive" and "gang affiliation evidence gave context to the shooting"].) There was also evidence the attackers shouted "West Side" during the attack. Such evidence was relevant to the circumstances of the charged offense and the expert testimony related to gang culture was relevant to help the jury understand the significance of the announcement of gang affiliation. (See *People v. Hernandez*, *supra*, 33 Cal.4th at pp. 1050–1051 [concluding failure to bifurcate gang allegations was harmless, reasoning, in part, "[m]uch of the gang evidence here was relevant to the charged offense … defendant … himself injected his gang status into the crime" by

identifying himself as a gang member; so, expert testimony regarding the significance of defendant's announcement of his gang affiliation was relevant to motive and use of fear].)  Furthermore, the gang evidence, including the expert testimony regarding witnesses' reluctance to talk to police or give information based on their fear of gangs, was relevant to the credibility of numerous witnesses whose statements at trial conflicted with their reports to police following the attack, to explain witnesses' reluctance to testify, and to explain Jose's failure to identify defendant at trial.  (See CALCRIM No. 1403; accord, *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1168–1169 [gang evidence may be relevant to witnesses' reluctance to testify and inconsistent statements]; *People v. Harris* (1985) 175 Cal.App.3d 944, 957 ["The trial court specifically and correctly found the evidence of gang membership to be admissible on the issue of credibility"]; see generally *Tran*, *supra*, 13 Cal.5th at p. 1209 ["We have held that a trial court is entitled to admit evidence demonstrating a fear of testifying"]; *People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449–1450 ["Testimony a witness is fearful of retaliation similarly relates to that witness's credibility and is also admissible.  [Citation.]  It is not necessary to show threats against the witness were made by the defendant personally, or the witness's fear of retaliation is directly linked to the defendant for the evidence to be admissible"].)  Thus, even if section 1109 required bifurcation of the gang enhancements, it is likely some, though not all, of the evidence of defendant's gang membership would have come in at a trial on the other substantive offenses.  (See *People v. Hernandez*, *supra*, at pp. 1049–1050 ["To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary"]; *People v. Samaniego*, *supra*, at p. 1167 ["evidence related to gang membership is not insulated from the general rule that all relevant evidence is admissible if it is relevant to a material issue in the case other than character, is not more prejudicial than probative, and is not cumulative"].)

Additionally, the jury was given a limiting instruction regarding its consideration of the gang evidence. Specifically, the court instructed the jury: "You may consider evidence of gang activity only for the limited purpose of deciding whether the defendant acted with the intent, purpose and knowledge that are required to prove the gang-related crimes and enhancements or special allegations charged or the defendant had a motive to commit the crimes charged. [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts or information relied on by an expert witness in reaching his or her opinion. You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is [a] person of bad character or that he has a disposition to commit crime." We presume the jury followed these instructions. (See *People v. Franklin* (2016) 248 Cal.App.4th 938, 953 ["We presume that the jury followed these limiting instructions (regarding considering gang evidence for a limited purpose), and there is nothing in this record to rebut that presumption"].)

We note some of the gang evidence, including evidence of the predicate offense in which defendant participated that involved another group attack during which the victim was stabbed, may not have been admissible in a bifurcated trial. Nevertheless, this does not change our conclusion. Here, evidence of the predicate offense involving defendant was limited—the entirety of the victim's testimony of the predicate offense with which defendant was involved constituted five pages of the multiple volume trial transcript. Additionally, the circumstances of that crime were not more inflammatory than those of the current offense. Furthermore, such evidence may have been held admissible on other grounds.[17]

_____

[17]Notably, evidence of the predicate offense with which defendant was involved may have been admissible under Evidence Code section 1101, subdivision (b) for another purpose such as on the issues of motive or intent to engage in violent coordinated group crimes without any reason or provocation other than to benefit his criminal street gang and pursue the gang's

Irrespective, based on the strength of the evidence of defendant's guilt, the relevance of much of the gang evidence in a trial on the underlying charges, and the admonitions to the jury, we cannot conclude defendant was prejudiced by the failure to bifurcate the gang allegations from the other charges. (See *People v. Hernandez*, *supra*, 33 Cal.4th at p. 1051 ["Any evidence admitted solely to prove the gang enhancement was not so minimally probative on the charged offense, and so inflammatory in comparison, that it threatened to sway the jury to convict regardless of defendants' actual guilt"].) Thus, we cannot conclude defendant is entitled to reversal and retrial of his remaining convictions on this basis.

## VI.  Additional Considerations on Remand

Because we are reversing the substantive gang count and the gang enhancements as discussed herein, a new sentencing hearing will necessarily result. At resentencing, the court and parties are advised to consider and apply any pertinent new laws the Legislature has passed during the pendency of this appeal including, but not limited to, Senate Bill No. 567 (2021–2022 Reg. Sess.) and Assembly Bill No. 518 (2021–2022 Reg. Sess.).

## DISPOSITION

Defendant's conviction for active participation in a criminal street gang (§ 186.22, subd. (a)) and the gang enhancements (§ 186.22, subd. (b)(1)) to counts 1 and 2 are reversed and the matter is remanded to the trial court for further proceedings consistent with this opinion. The People shall have 60 days from the date of the remittitur in which

---

objectives. (See *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1212.) With regard to that predicate offense, the gang expert noted the group called the victim of the offense a "Peckerwood," which refers to a Caucasian gang, and that several subjects yelled "West Side" before or after that assault (as they did here). The gang expert testified the circumstances of the predicate offense suggested West Side Poros gang members were confronting the victim, who they believed to be a member of a rival gang in their territory, telling him to get off this street or get out of that area. However, the victim denied being involved in gangs, stated he only knew one of the five males from juvenile hall, and he did not have a dispute with them before.

29.

to file an election to retry defendant on the active participation in a criminal street gang charge and the gang enhancements.  If the People elect not to retry the defendant on this charge and the enhancements, the trial court shall modify the judgment by striking defendant's convictions for count 3 (§ 186.22, subd. (a)) and the gang enhancements and shall resentence defendant accordingly.  In all other respects, the judgment is affirmed.


                                                         PEÑA, J.

WE CONCUR:


POOCHIGIAN, Acting P. J.


DETJEN, J.

30.