Filed 7/9/25  P. v. Mendez CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JUAN PABLO MENDEZ,<br><br>    Defendant and Appellant. | A172229<br><br>(Napa County<br>Super. Ct. No. CR115810) |

Juan Pablo Mendez appeals from a trial court order extending his involuntary commitment to the State Department of State Hospitals (DSH) by one year as an offender with a mental health disorder (OMHD) under Penal Code section 2972.[1] [2]

Mendez contends we should reverse the order for four reasons.  He challenges the sufficiency of the evidence supporting the trial court's conclusion that his mental health disorder was not in sufficient remission to allow for outpatient treatment and that his disorder could not be safely and effectively treated as an outpatient.  Mendez argues the trial court abused its

_____

[1] OMHDs were previously referred to as " 'mentally disordered offenders' or 'MDOs,' " but the Legislature changed the terminology in 2019. (See *People v. McCray* (2023) 98 Cal.App.5th 260, 264, fn. 1.)

[2] All statutory references are to the Penal Code unless otherwise indicated.

discretion by failing to make a finding whether there was reasonable cause to believe he could be safely and effectively treated on an outpatient basis. He alternatively claims he received ineffective assistance of counsel by failing to request the court make such a finding.

Mendez further argues his involuntary medication order must be vacated.

We affirm.

## I. BACKGROUND[3]

Over three decades ago, Mendez was found not guilty by reason of insanity (NGI) for charges of intent to commit rape and false imprisonment, and he was committed to the DSH. While committed as an NGI patient to DSH-Napa, Mendez "stabbed a peer three times with a handmade shank," for which he was convicted of assault with a deadly weapon and committed as an OMHD. He has been committed as an OHMD to DSH-Coalinga since 2013.

In July 2024, the Napa County District Attorney petitioned to extend Mendez's commitment as an OMHD (the petition). Mendez waived a jury trial, and the trial court held a hearing in December 2024. Mendez was then 74 years old.

At the hearing, the trial court considered the live testimony of Dr. Elizabeth Gates, a DSH forensic psychologist, as well as a report she prepared in June 2024 "to provide an opinion as to whether Mr. Mendez meets criteria for involuntary treatment pursuant to [section] 2972 for the

---

[3] We limit our exposition of the procedural history to the facts relevant to the resolution of this appeal. We incorporate by reference the procedural history sections from Mendez's prior appeals, *People v. Mendez* (Jan. 31, 2017, A147173) (nonpub. opn.) and *People v. Mendez* (2018) 21 Cal.App.5th 654. (See *Estate of Kempton* (2023) 91 Cal.App.5th 189, 193, fn. 2 [taking judicial notice of nonpublished opinion on court's own motion]; Evid. Code, § 452, subds. (a), (d); Cal. Rules of Court, rule 8.1115(b)(1).)

2

period from 1/01/25 to 1/01/26." The court also considered Mendez's criminal records and medical records, including his annual psychiatric evaluation performed in February 2024 by DSH psychiatrist, Dr. Basant Singh (annual evaluation), a DSH treatment plan for Mendez finalized in August 2024 (treatment plan), and an involuntary medication order issued on October 7, 2024 (IMO).[4]

Dr. Gates diagnosed Mendez with schizoaffective disorder bipolar type, which qualifies as a severe mental health disorder as defined by section 2962 and which Dr. Gates described as incurable. She relayed that Mendez's symptoms included visual and auditory hallucinations, disorganized thoughts, paranoia, hypersexuality, distractibility, labile mood, odd mannerisms, poor grooming and hygiene, homicidal ideation, and manic symptoms.

Dr. Gates testified that Mendez was not in remission. She based her opinion on his documented signs and symptoms in the last year. As recently as December 2024, Mendez informed Dr. Gates that "the spirits are still there." Moreover, Dr. Singh stated in the annual evaluation that Mendez "still complain[ed] about hearing voices . . . [and] said that they [were] part of his day-to-day life." The treatment plan likewise determined that Mendez had not sufficiently managed his psychiatric symptoms over the prior 12 months because he still heard " 'spirits' " and "report[ed] he [was] Jesus Christ."

Dr. Gates further opined that Mendez could not reach remission without treatment because he failed to follow the treatment plan. She

---

[4] The OMHD-qualifying crime occurred in Napa County, but the IMO was issued by the Fresno County Superior Court, where DSH-Coalinga is located. (Evid. Code § 452, subd. (h) [permitting judicial notice of indisputable facts].)

posited that the IMO—in which the Fresno County Superior Court found by clear and convincing evidence Mendez lacked capacity to refuse treatment—"will probably preclude him from ever" demonstrating he can be kept in remission without treatment. She also testified that Mendez told her, only one week earlier, "he would not take [his medications] in the community."

The annual evaluation and the treatment plan echoed similar concerns. The annual evaluation completed in April 2024 identified Mendez's history of chronic psychosis upon discontinuing his medication. Mendez refused to participate in a mental state examination and complained of hearing voices from angels and spirits. Because Mendez had limited insight and judgment concerning his mental illness, he did not see a need to take medication. Dr. Singh described episodes in 2014 and 2018 where Mendez discontinued his medication, decompensated, and became violent. In the 2018 episode, "he was placed on line of sight (LOS) for danger to others" because, at least in part, he threatened to " 'crush [a peer's] skull.' " Nonetheless, Mendez continued to "not see himself to be mentally ill. . . . [or] the need for treatment, despite his past history of decompensation whenever he stops his medication." He only took medication due to the medication order.

The treatment plan completed in August 2024 stated that, per chart records, Mendez endorsed symptoms including persecutory and paranoid delusions, command auditory and visual hallucinations, disorganization and thought blocking. The plan also identified eight incidents of violence occurring in 2020 and 2021, each involving Mendez assaulting peers without provocation. Within the last year, however, Mendez had also been a *victim* of several attacks by peers. The report acknowledged that Mendez would benefit from treatment groups focused on "Release Readiness," impulsivity, and substance abuse. The plan identified many of the treatment objectives

4

as either unmet or partially met. It further noted that Mendez "repeatedly stated . . . to [staff] that he does not believe in medication and will probably not take psychotropic medications if given a choice."[5]

Dr. Gates opined that Mendez represented a substantial danger of physical harm to others. She granted that Mendez had not exhibited violence in the last three and a half years, had been assessed as having a low risk of institutional violence, and suffered from "mobility and agility problems." Dr. Gates also conceded that the nature of Mendez's hallucinations had been "benign" for the last three and a half years, in contrast to their past "malevolent" nature. She further believed that Mendez had a viable release plan because, although she had not seen it, "the [DSH] staff [gave] him a completion status."

Despite those concessions, Dr. Gates maintained that Mendez remained dangerous to others due to past aggressive outbursts attributable to his hallucinations. She documented nine instances between February 2017 and May 2021 during which Mendez exhibited "aggressive, threatening, or violent behavior while symptomatic." And she testified that Mendez ascribed his past violent incidents to when "he would be talking to the spirits." Dr. Gates reiterated that Mendez "flat out" stated "he would not take medication in the community," and she explained that "from [her] experience" individuals with such limited insight to their own condition often "decompensate." Her conclusion was in line with the annual evaluation, which stated: "[A]nytime [Mendez] discontinued his medication, as it

---

[5] Accordingly, the treatment plan recommended that Mendez enroll in a "medication education" group. Although Dr. Gates's report noted that Mendez "[was] not participating well in his core group" and did not attend "the recommended core groups" for his treatment, he did complete a "Release Readiness" group in August 2024.

5

happened in 2014 and again in 2018, he decompensate[d], he [became] psychotic and start[ed] hearing voices. At some point, he even becomes violent." Thus, Dr. Gates opined that if Mendez were released, he would cease taking his medications and "his symptoms [would] get worse," and therefore he presented a substantial danger to others.

Defense counsel argued there was insufficient evidence for the court to find beyond a reasonable doubt that Mendez presented a substantial danger to others. Counsel stressed Mendez's advanced age, mobility issues, and nonviolent behavior over the last three and a half years. Counsel also characterized Dr. Gates's testimony about Mendez's dangerousness as "ambivalen[t]" especially given her admission that he had "a viable release plan."

The trial court granted the petition, extending Mendez's commitment to January 1, 2026. It first found that the prosecutor proved beyond a reasonable doubt that Mendez has a severe mental health disorder, which "is not in remission or can't be kept in remission without continued treatment, including taking medication." The court then addressed the "closer question" of whether Mendez represented a substantial danger of physical harm to others because of his mental condition. In the court's view, it was "clear from the record" that "Mendez lack[ed] any insight with respect to his mental condition" and did not "believe that he needs to take medication," and the court stated that the IMO was in place "because of that." The court continued: "[D]octors have indicated in their opinion [Mendez] will decompensate if he is left to himself . . . and he would represent a substantial danger of physical harm to others when he does decompensate because of not taking medication." It therefore found that, as a result of his severe mental

6

health disorder, Mendez presented a substantial danger of physical harm to others.

Defense counsel then requested that the trial court place Mendez in outpatient treatment. The prosecutor did not object, but she professed a lack of familiarity with outpatient treatment under "[section] 2970." And, although she had earlier observed that "the most recent [conditional release program] report [stated that Mendez] was not [community outpatient treatment] ready," she stated that she did not know the conditional release program's (CONREP) current position on the matter. The court asked defense counsel to clarify if he was referring to "[section] 2972," but counsel "confess[ed]" he was "more familiar with the procedure in [another statutory] context." The court rejoined that it "was trying to allude to that in my order, but I don't know how to do it, that I think that it would be appropriate to take a look at outpatient treatment for Mr. Mendez in a supervised setting through [CONREP]." The court continued, "[T]hey mention[ed] that [Mendez] needed to continue to take his medication voluntarily. And I don't know how you do . . . that because there's an involuntary medication order in there per year." The trial court then suggested vacating the IMO until learning the IMO "was made in another county."

The prosecutor then quoted section 2972, subdivision (d) (although she attributed the passage to "[section] 2962(d)"): " 'A person shall be released on outpatient status if the committing court finds that there is reasonable cause to believe that the committed person can be safely and effectively treated on an outpatient basis.' " Defense counsel stated that, under that section, "the Court would have the latitude to refer the matter to [CONREP] for a report regarding appropriateness of outpatient treatment." In response, the prosecutor suggested that the court could issue an order stating it was

7

"inclined to release [Mendez] on outpatient [status] and [to] refer[] [the matter] to [CONREP] for . . . . terms and conditions."

But the trial court rejected that approach, explaining: "I'm not inclined to release him on outpatient per se now because I don't know what all the terms and conditions of that would be. And I'm just saying that he needs to voluntarily take his medication and comply with the treatment plan. And I believe that [CONREP] should be reconsidered before the next one year." The court therefore extended Mendez's commitment, continuing his inpatient treatment, and ordered DSH-Coalinga and CONREP to evaluate Mendez within six months.

Mendez appealed.

## II. DISCUSSION

### A. *The Statutory Scheme*

The Legislature enacted a statutory framework which " 'require[s] that an offender who has been convicted of a specified felony related to a severe mental disorder and who continues to pose a danger to society to receive appropriate treatment until the disorder can be kept in remission.' " (*People v. Foster* (2019) 7 Cal.5th 1202, 1207 (*Foster*).) The law permits involuntary treatment to be imposed even following an offender's release from parole. (§§ 2970, 2972; see *Foster*, at pp. 1207–1208.)

Prior to the end of an offender's parole term, "[s]ection 2970 permits a district attorney, on the recommendation of medical professionals, to petition to recommit an offender as an [OHMD] for an additional one-year term." (*Foster, supra*, 7 Cal.5th at p. 1208.) Under section 2972, "[t]he court shall conduct a hearing on the petition under Section 2970 for continued treatment." (§ 2972, subd. (a)(1).) To extend an OHMD's commitment, the court or jury must find " '[(1)] that the patient has a severe mental disorder,

[(2)] that the patient's severe mental disorder is not in remission or cannot be kept in remission without treatment, and [(3)] that by reason of his or her severe mental disorder, the patient represents a substantial danger of physical harm to others.' (§ 2972, subd. (c).)" (*Foster*, at p. 1208.) A showing of substantial danger to others does not require "a finding of recent dangerousness" or " 'proof of a recent overt act.' " (*In re Qawi* (2004) 32 Cal.4th 1, 24 (*Qawi*); § 2962, subd. (g).) "The 'cannot be kept in remission without treatment' standard can also be found when a person 'has not voluntarily followed the treatment plan' during the year prior to the commitment or recommitment proceeding." (*Qawi*, at p. 24.) "In determining if a person has voluntarily followed the treatment plan, the standard is whether the person has acted as a reasonable person would in following the treatment plan." (§ 2962, subd. (a)(3).)

As happened here, the prosecutor may file a petition for recommitment before a postparole commitment term ends, which initiates another recommitment proceeding under the same procedures. (§ 2972, subd. (e).)

Even if recommitment is appropriate under section 2972, subdivision (c) (section 2972(c)), section 2972, subdivision (d) (section 2972(d)) provides an opportunity for outpatient treatment. (*People v. Gregerson* (2011) 202 Cal.App.4th 306, 314 (*Gregerson*).) Under section 2972(d), the court "shall" release the OMHD "on outpatient status if the committing court finds that there is reasonable cause to believe that the committed person can be safely and effectively treated on an outpatient basis." (§ 2972, subd. (d).)[6]

---

[6] Section 2972(d) states in full: "A person shall be released on outpatient status if the committing court finds that there is reasonable cause to believe that the committed person can be safely and effectively treated on an outpatient basis. Except as provided in this subdivision, the provisions of Title 15 (commencing with Section 1600) of Part 2 apply to persons placed on

9

The offender bears the burden to show " 'reasonable cause to believe' " outpatient treatment would be safe and effective. (*Gregerson*, at p. 317.) "Thus, to obtain outpatient treatment, the patient must raise a strong suspicion in a person of ordinary prudence that outpatient treatment would be safe and effective." (*Id.* at p. 319.)

## B. The Trial Court's Recommitment Order Was Supported By Substantial Evidence

Mendez challenges the evidentiary basis for the court's finding that his "release to CONREP would necessarily pose a substantial danger of physical harm to him or to the public." (Boldface and capitalization omitted.) This framing appears to conflate section 2972(c)—under which a necessary element for recommitment is that the OHMD represents a substantial danger of physical harm to others due to their mental condition—and section 2972(d)—which governs whether a court "shall" release a recommitted OHMD to CONREP for outpatient treatment. Thus, we initially dispatch any contention that insufficient evidence supported recommitting Mendez under section 2972(c).

In considering the sufficiency of the evidence to support the trial court's recommitment findings, we must determine " 'whether, on the whole record, [the court] could have found that [a] defendant is an [OHMD] beyond a reasonable doubt, considering all the evidence in the light which is most favorable to the People, and drawing all inferences the trier could reasonably have made to support the finding.' " (*People v. Johnson* (2020) 55 Cal.App.5th 96, 107 (*Johnson*).)

---

outpatient status pursuant to this paragraph. The standard for revocation under Section 1609 is that the person cannot be safely and effectively treated on an outpatient basis." (§ 2972, subd. (d).)

10

First, Mendez does not dispute that he has a severe mental health disorder. Second, substantial evidence shows that, in the year preceding the petition, Mendez failed to voluntarily follow his treatment plan "as a reasonable person would" (§ 2962, subd. (a)(3)), establishing that he cannot be kept in remission without treatment. (*Qawi*, *supra*, 32 Cal.4th at p. 24.) Namely, he expressed to staff and several psychologists that he does not believe he needs medication and would not take any if left to his own devices *despite* his continued, daily hallucinations and his experiences in 2014 and 2018 of further decompensating when he stopped taking his medications. The record further illustrates that his treatment objectives were either unmet or only partially met. The objective for him to gain insight about his psychotropic medication, meet regularly with the psychiatrist, and discuss medication, symptoms, and side effects, was not met. Mendez's contention on appeal that "there really is no way to know about [his] willingness to medicate" is unpersuasive.

Third, given Mendez's history of aggression and threats during his decompensation episodes in 2014 and 2018, coupled with his aggressive behaviors in 2020 and 2021, and considering his overall progress in treatment, a rational trier of fact could conclude beyond a reasonable doubt that Mendez still posed a substantial danger of physical harm to others due to his severe mental health disorder. Indeed, Dr. Gates's opinions were based, in part, on the fact that Mendez was "not in core [treatment] groups to manage his symptoms" and "appear[ed] to maintain a pattern of similar psychiatric symptoms that were foundational to his qualifying offense."

It follows that we disagree with Mendez's assertion that Dr. Gates's opinion was based on conjecture. Due to the IMO, Mendez has consistently been on his medication since 2018. Dr. Gates's opinion, that Mendez would

11

present a substantial danger to others if he failed to take his medication, was rooted in Mendez's own history, specifically his lack of insight into his illness, history of violence, and repeated statements that he does not need medication and would not take it if given the choice.

Mendez's threatening behavior when he decompensated renders his authorities inapposite. In *People v. Cheatham* (2022) 82 Cal.App.5th 782, 787, there was evidence that the offender " 'ha[d] serious difficulty controlling his behavior' and 'c[ould]n't be trusted to continue to take his medication if he's totally unsupervised.' " But the offender "never once engaged in behavior dangerous to others because of his mental disorder. Nor ha[d] he ever indicated that he *might* engage in this type of behavior." (*Id.* at p. 786.) In *Johnson*, *supra*, 55 Cal.App.5th 96, our colleagues in Division Two explained, "during appellant's approximately 11 years in the community under CONREP supervision, between 2003 and 2014, there was no evidence of a single violent—or even aggressive—incident." (*Id.* at p. 109.) "[T]he *sole* evidence the [trial] court relied on to support the dangerousness finding was appellant's violence from decades earlier, with only friendly and nonconfrontational behavior ever since, even while he was AWOL from CONREP, off of his medications for a significant period of time, and decompensating." (*Id.* at p. 110.) Similarly, in *People v. Jenkins* (2023) 95 Cal.App.5th 142, 152, the court's review of the offender's altercations with other patients "show[ed] that Jenkins did not act with physical aggression or violence in any of the described incidents." (See *id.* at p. 155 ["The record here similarly lacks evidence that Jenkins has committed any act of violence or physical aggression after her commitment offense in 1999."].)

12

In sum, the trial court did not err in finding that the elements to recommit Mendez were met beyond a reasonable doubt pursuant to section 2972(c).

## C. *The Trial Court Did Not Err In Applying Section 2972(d) and Substantial Evidence Supported Its Disposition*

Mendez argues that insufficient evidence supported the trial court's conclusion that his mental health disorder could not be safely and effectively treated in an outpatient setting. He also contends "[t]he trial court failed to make any finding as to any reasonable cause to believe" whether he could be safely and effectively treated as an outpatient. Neither contention has merit.

" 'We imply all findings necessary to support the judgment, and our review is limited to whether there is substantial evidence in the record to support these implied findings.' " (*People v. Francis* (2002) 98 Cal.App.4th 873, 878.) Based on the record in this case, we reject the contention the trial court needed to articulate specific findings beyond its denial of outpatient treatment. Section 2972(d) imposes no such requirement upon the court. To the extent Mendez argues ambiguity in the record whether the trial court understood the applicable standard of proof, we concentrate our inquiry on whether substantial evidence supported the trial court's implied finding that there was no reasonable cause to believe Mendez could be safely and effectively treated as an outpatient. When reviewing a challenge to a trial court's denial of outpatient status based on insufficient evidence, we apply the substantial evidence standard of review. (*Gregerson, supra,* 202 Cal.App.4th at p. 320.) "If the court denies outpatient treatment, its order will be affirmed if substantial evidence shows there was no such reasonable cause. In any event, if substantial evidence does not support the court's order, it must be reversed." (*Ibid.*)

13

There is no dispute that Mendez requested outpatient treatment. Therefore, at the recommitment hearing, the trial court was required to release Mendez to outpatient status if there was "reasonable cause to believe [Mendez] can be safely and effectively treated on an outpatient basis." (§ 2972, subd. (d); see *People v. May* (2007) 155 Cal.App.4th 350, 363 (*May*) ["By authorizing the court to order outpatient placement as a disposition at annual civil recommitment hearings, the Legislature avoided the need for separate hearings devoted to outpatient release issues during an [OHMD's] term of commitment."]; cf. *Gregerson*, *supra*, 202 Cal.App.4th at p. 315 ["the court must consider outpatient treatment only in response to a request"].)

The record amply supports the trial court's implied finding that Mendez failed to bear his burden. Earlier that year CONREP determined Mendez was "not appropriate for discharge" as an outpatient, and in the interim Mendez "flat out" declared "he would not take medication in the community." As discussed, *ante*, Mendez decompensated the last time he was off medications and became threatening. Although a court's "substantial danger" determination under section 2972(c) is separate from the inquiry under section 2972(d), the same evidence supports a finding that there was no reasonable cause to believe Mendez could be safely and effectively treated as an outpatient.

Mendez's unsupported assertions that the trial court "did not apply the proper standard of proof" and "misapprehended how CONREP works" are not well taken. (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 146 [" 'In order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record.' "].) First, Mendez's assertion "[t]here was solid evidence" that outpatient treatment was appropriate, does not

14

demonstrate the court applied the wrong standard of proof. Even assuming that Mendez had proffered prima facie evidence raising a strong suspicion in a person of ordinary prudence that outpatient treatment would be safe and effective (*Gregerson*, *supra*, 202 Cal.App.4th at p. 317), the prosecution presented substantial evidence refuting his case. Second, the court did not cede its discretion nor decide to "wait for CONREP to act"; rather, it ordered CONREP and DSH to "*evaluate* Mr. Mendez within the next six months for a *possibility* of outpatient treatment through [CONREP]." (Italics added.) Thus, the court tacitly acknowledged it would decide the issue after that evaluation. Here, we decline to read the court's receptiveness to a six-month review as a failure to reach its own independent judgment.

Contrary to Mendez's contention, the record does not disclose that the trial court was "unaware" of the scope of its authority. It shows the opposite. The court correctly identified section 2972 as the governing provision and the prosecutor read subdivision (d) in open court. The court then unequivocally rejected the prosecutor's suggestion that it "refer [the matter] to [CONREP] for . . . . terms and conditions," stating it was "not inclined to release [Mendez] on outpatient per se now." The court explained it did not know what the terms and conditions would be and emphasized that Mendez needed to "voluntarily take his medication and comply with the treatment plan." It reiterated: "I think if [Mendez] takes his medication voluntarily and follows his treatment plan, I think [CONREP] would be the appropriate way." The trial court's comments about "not know[ing] what all the terms and conditions [of outpatient treatment] would be" are best understood as the court's determination that additional information was necessary—given the record then before it—for the court to find reasonable cause to believe Mendez could be "safely and effectively treated on an outpatient basis."

15

(§ 2972, subd. (d).) And, as stated, the evidence at trial suggested Mendez was not yet appropriate for outpatient treatment.

Mendez's reliance on *May* is misplaced. In *May*, the prosecution explained to the trial court that "under section 2964, the process [to evaluate the suitability of outpatient treatment] had to start with the [DSH] and the Board of Prison Terms (now the Board of Parole Hearings). The court responded, 'We are not there yet,' and refused to allow questions from May's counsel about conclusions in a CONREP report." (*May*, *supra*, 155 Cal.App.4th at p. 356.) After the court granted the recommitment order, May sought reconsideration, "argu[ing] that the court had authority to address at the recommitment hearing whether May should be placed in outpatient treatment." (*Ibid.*) The court "decid[ed] that the matter should be referred to CONREP for a recommendation and further hearing," and it continued the matter "for 30 days in anticipation of a CONREP report." (*Id.* at p. 357.) Based on those proceedings, Division Three of this court determined "that the trial court failed to appreciate it had authority to order outpatient treatment for May as part of the disposition on the petition to extend his involuntary treatment." (*Id.* at p. 363.)

That is not what happened here. The trial court did not restrict the parties from presenting evidence about Mendez's readiness for outpatient treatment, as occurred in *May*. (*May*, *supra*, 155 Cal.App.4th at p. 356.) Here, in reciting its recommitment findings, the court stated: "I would like to acknowledge Mr. Mendez, that he has been doing well. And I'd like to see that he takes his medications voluntarily and that he comply with the recommendations of [CONREP] so that he can, under appropriate circumstances, be released under [CONREP] in a supervised setting." Mendez's counsel then asked the court to consider outpatient treatment for

16

Mendez as part of that hearing and the court immediately took up the issue. It referenced the applicable statute. The prosecutor read the proper legal standard and referenced CONREP's last evaluation contained within the treatment plan. The court indicated it was "not inclined to release [Mendez] on outpatient per se now . . . ." The court understood its authority to order outpatient treatment at the recommitment hearing, and it denied the request. That the court specifically requested an outpatient evaluation to occur within the next six months does not show the trial court misunderstood its responsibility. The trial court acted to ensure it would have before it at a future hearing information addressing Mendez's readiness for outpatient treatment. In sum, even if we treat the court's finding that Mendez could not be safely and effectively treated on an outpatient basis as an implied finding, we conclude it was supported by substantial evidence.

## D. *Mendez's Other Arguments Fail*

Mendez argues, in the alternative, that he received ineffective assistance of counsel. He suggests that defense counsel's representation of him was unconstitutionally deficient by failing to "clarify[]" his request for outpatient treatment or to hire a defense expert. These arguments are untenable.

Defense counsel *did* remind the trial court of its authority to "make orders with regard to outpatient treatment" and then asked for such an order. Mendez does not attempt to show that, by "not clarifying his request," counsel's representation "fell below an objective standard of reasonableness and that counsel's deficient performance was prejudicial." (*People v. Villegas* (2023) 97 Cal.App.5th 253, 266.) Likewise, Mendez fails to argue that defense counsel acted unreasonably in not hiring an expert or that he suffered prejudice for want of one. These claims are therefore forfeited.

17

(*People v. Blomdahl* (1993) 16 Cal.App.4th 1242, 1248 [" ' "It is not sufficient to allege merely that the attorney's tactics were poor, or that the case might have been handled more effectively.  [Citations.] [¶] Rather, the defendant must affirmatively show that the omissions of defense counsel involved a critical issue, and that the omissions cannot be explained on the basis of any knowledgeable choice of tactics." ' "]; *People v. Stanley* (1995) 10 Cal.4th 764, 825 ["Defendant's contention his trial counsel rendered ineffective assistance by failing to object to the evidence accordingly also must fail for want of prejudice."].)

Mendez also contends that we must vacate the IMO given the lack of evidence supporting the recommitment order.  Even if he was correct on the merits, we lack jurisdiction to review the IMO because he failed to properly appeal it.  Mendez's notice of appeal was from Napa County Superior Court case No. CR115810.  In contrast, the IMO was issued in Fresno County Superior Court case No. 24CRAD687456, and it was separately appealable. (E.g., *State Dept. of State Hospitals v. A.H.* (2018) 27 Cal.App.5th 441, 443.) Where several judgments or orders are separately appealable, each appealable judgment must be specified in a notice of appeal.  (*Filbin v. Fitzgerald* (2012) 211 Cal.App.4th 154, 173.)  Mendez's notice of appeal failed to mention the IMO.  This forecloses his challenge.  (*Ibid.* ["The policy of liberally construing a notice of appeal in favor of its sufficiency [citation] does not apply if the notice is so specific it cannot be read as reaching a judgment or order not mentioned at all."].)

### III.  DISPOSITION

The judgment is affirmed.

SMILEY, J.


WE CONCUR:


HUMES, P. J.


LANGHORNE WILSON, J.


A172229
*People v. Mendez*

19